(Slip Opinion)        OCTOBER TERM, 2016        1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## PACKINGHAM *v.* NORTH CAROLINA

### CERTIORARI TO THE SUPREME COURT OF NORTH CAROLINA

No. 15–1194. Argued February 27, 2017—Decided June 19, 2017

North Carolina law makes it a felony for a registered sex offender "to access a commercial social networking Web site where the sex offender knows that the site permits minor children to become members or to create or maintain personal Web pages." N. C. Gen. Stat. Ann. §§14–202.5(a), (e). According to sources cited to the Court, the State has prosecuted over 1,000 people for violating this law, including petitioner, who was indicted after posting a statement on his personal Facebook profile about a positive experience in traffic court. The trial court denied petitioner's motion to dismiss the indictment on the ground that the law violated the First Amendment. He was convicted and given a suspended prison sentence. On appeal, the State Court of Appeals struck down §14–202.5 on First Amendment grounds, but the State Supreme Court reversed.

*Held*: The North Carolina statute impermissibly restricts lawful speech in violation of the First Amendment. Pp. 4–10.

(a) A fundamental First Amendment principle is that all persons have access to places where they can speak and listen, and then, after reflection, speak and listen once more. Today, one of the most important places to exchange views is cyberspace, particularly social media, which offers "relatively unlimited, low-cost capacity for communication of all kinds," *Reno* v. *American Civil Liberties Union*, 521 U. S. 844, 870, to users engaged in a wide array of protected First Amendment activity on any number of diverse topics. The Internet's forces and directions are so new, so protean, and so far reaching that courts must be conscious that what they say today may be obsolete tomorrow. Here, in one of the first cases the Court has taken to address the relationship between the First Amendment and the modern Internet, the Court must exercise extreme caution before suggesting that the First Amendment provides scant protection for access to vast

networks in that medium.  Pp. 4–6.

(b) This background informs the analysis of the statute at issue. Even assuming that the statute is content neutral and thus subject to intermediate scrutiny, the provision is not ""'"narrowly tailored to serve a significant governmental interest."'"  *McCullen* v. *Coakley*, 573 U. S. ___, ___.  Like other inventions heralded as advances in human progress, the Internet and social media will be exploited by the criminal mind.  It is also clear that "sexual abuse of a child is a most serious crime and an act repugnant to the moral instincts of a decent people," *Ashcroft* v. *Free Speech Coalition*, 535 U. S. 234, 244, and that a legislature "may pass valid laws to protect children" and other sexual assault victims, *id.,* at 245.  However, the assertion of a valid governmental interest "cannot, in every context, be insulated from all constitutional protections."  *Stanley* v. *Georgia*, 394 U. S. 557, 563.

Two assumptions are made in resolving this case.  First, while the Court need not decide the statute's precise scope, it is enough to assume that the law applies to commonplace social networking sites like Facebook, LinkedIn, and Twitter.  Second, the Court assumes that the First Amendment permits a State to enact specific, narrowly-tailored laws that prohibit a sex offender from engaging in conduct that often presages a sexual crime, like contacting a minor or using a website to gather information about a minor.

Even with these assumptions, the statute here enacts a prohibition unprecedented in the scope of First Amendment speech it burdens. Social media allows users to gain access to information and communicate with one another on any subject that might come to mind. With one broad stroke, North Carolina bars access to what for many are the principal sources for knowing current events, checking ads for employment, speaking and listening in the modern public square, and otherwise exploring the vast realms of human thought and knowledge.  Foreclosing access to social media altogether thus prevents users from engaging in the legitimate exercise of First Amendment rights.  Even convicted criminals—and in some instances especially convicted criminals—might receive legitimate benefits from these means for access to the world of ideas, particularly if they seek to reform and to pursue lawful and rewarding lives.  Pp. 6–8.

(c) The State has not met its burden to show that this sweeping law is necessary or legitimate to serve its purpose of keeping convicted sex offenders away from vulnerable victims.  No case or holding of this Court has approved of a statute as broad in its reach.  The State relies on *Burson* v. *Freeman*, 504 U. S. 191, but that case considered a more limited restriction—prohibiting campaigning within 100 feet of a polling place—in order to protect the fundamental right to vote.

Syllabus

The Court noted, moreover, that a larger buffer zone could "become an impermissible burden" under the First Amendment. *Id.,* at 210. The better analogy is *Board of Airport Comm'rs of Los Angeles* v. *Jews for Jesus, Inc.*, 482 U. S. 569. If an ordinance prohibiting any "First Amendment activities" at a single Los Angeles airport could be struck down because it covered all manner of protected, nondisruptive behavior, including "talking and reading, or the wearing of campaign buttons or symbolic clothing," *id.,* at 571, 575, it follows with even greater force that the State may not enact this complete bar to the exercise of First Amendment rights on websites integral to the fabric of modern society and culture. Pp. 9–10.

368 N. C. 380, 777 S. E. 2d 738, reversed and remanded.

KENNEDY, J., delivered the opinion of the Court, in which GINSBURG, BREYER, SOTOMAYOR, and KAGAN, JJ., joined. ALITO, J., filed an opinion concurring in the judgment, in which ROBERTS, C. J., and THOMAS, J., joined. GORSUCH, J., took no part in the consideration or decision of the case.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 15–1194

## LESTER GERARD PACKINGHAM, PETITIONER *v.* NORTH CAROLINA

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF NORTH CAROLINA

[June 19, 2017]

JUSTICE KENNEDY delivered the opinion of the Court.

In 2008, North Carolina enacted a statute making it a felony for a registered sex offender to gain access to a number of websites, including commonplace social media websites like Facebook and Twitter. The question presented is whether that law is permissible under the First Amendment's Free Speech Clause, applicable to the States under the Due Process Clause of the Fourteenth Amendment.

I

A

North Carolina law makes it a felony for a registered sex offender "to access a commercial social networking Web site where the sex offender knows that the site permits minor children to become members or to create or maintain personal Web pages." N. C. Gen. Stat. Ann. §§14–202.5(a), (e) (2015). A "commercial social networking Web site" is defined as a website that meets four criteria. First, it "[i]s operated by a person who derives revenue from membership fees, advertising, or other sources related to the operation of the Web site." §14–202.5(b).

Second, it "[f]acilitates the social introduction between two or more persons for the purposes of friendship, meeting other persons, or information exchanges." *Ibid.* Third, it "[a]llows users to create Web pages or personal profiles that contain information such as the name or nickname of the user, photographs placed on the personal Web page by the user, other personal information about the user, and links to other personal Web pages on the commercial social networking Web site of friends or associates of the user that may be accessed by other users or visitors to the Web site." *Ibid.* And fourth, it "[p]rovides users or visitors . . . mechanisms to communicate with other users, such as a message board, chat room, electronic mail, or instant messenger." *Ibid.*

The statute includes two express exemptions. The statutory bar does not extend to websites that "[p]rovid[e] only one of the following discrete services: photo-sharing, electronic mail, instant messenger, or chat room or message board platform." §14–202.5(c)(1). The law also does not encompass websites that have as their "primary purpose the facilitation of commercial transactions involving goods or services between [their] members or visitors." §14–202.5(c)(2).

According to sources cited to the Court, §14–202.5 applies to about 20,000 people in North Carolina and the State has prosecuted over 1,000 people for violating it. Brief for Petitioner 6–8.

B

In 2002, petitioner Lester Gerard Packingham—then a 21-year-old college student—had sex with a 13-year-old girl. He pleaded guilty to taking indecent liberties with a child. Because this crime qualifies as "an offense against a minor," petitioner was required to register as a sex offender—a status that can endure for 30 years or more. See §14–208.6A; see §14–208.7(a). As a registered sex

offender, petitioner was barred under §14–202.5 from gaining access to commercial social networking sites.

In 2010, a state court dismissed a traffic ticket against petitioner. In response, he logged on to Facebook.com and posted the following statement on his personal profile:

> "Man God is Good! How about I got so much favor they dismissed the ticket before court even started? No fine, no court cost, no nothing spent. . . . . .Praise be to GOD, WOW! Thanks JESUS!" App. 136.

At the time, a member of the Durham Police Department was investigating registered sex offenders who were thought to be violating §14–202.5. The officer noticed that a "'J. R. Gerrard'" had posted the statement quoted above. 368 N. C. 380, 381, 777 S. E. 2d 738, 742 (2015). By checking court records, the officer discovered that a traffic citation for petitioner had been dismissed around the time of the post. Evidence obtained by search warrant confirmed the officer's suspicions that petitioner was J. R. Gerrard.

Petitioner was indicted by a grand jury for violating §14–202.5. The trial court denied his motion to dismiss the indictment on the grounds that the charge against him violated the First Amendment. Petitioner was ultimately convicted and given a suspended prison sentence. At no point during trial or sentencing did the State allege that petitioner contacted a minor—or committed any other illicit act—on the Internet.

Petitioner appealed to the Court of Appeals of North Carolina. That court struck down §14–202.5 on First Amendment grounds, explaining that the law is not narrowly tailored to serve the State's legitimate interest in protecting minors from sexual abuse. 229 N. C. App. 293, 304, 748 S. E. 2d 146, 154 (2013). Rather, the law "arbitrarily burdens all registered sex offenders by preventing a wide range of communication and expressive activity

unrelated to achieving its purported goal." *Ibid.* The North Carolina Supreme Court reversed, concluding that the law is "constitutional in all respects." 368 N. C., at 381, 777 S. E. 2d, at 741. Among other things, the court explained that the law is "carefully tailored . . . to prohibit registered sex offenders from accessing only those Web sites that allow them the opportunity to gather information about minors." *Id.*, at 389, 777 S. E. 2d, at 747. The court also held that the law leaves open adequate alternative means of communication because it permits petitioner to gain access to websites that the court believed perform the "same or similar" functions as social media, such as the Paula Deen Network and the website for the local NBC affiliate. *Id.*, at 390, 777 S. E. 2d, at 747. Two justices dissented. They stated that the law impermissibly "creates a criminal prohibition of alarming breadth and extends well beyond the evils the State seeks to combat." *Id.*, at 401, 777 S. E. 2d, at 754 (opinion of Hudson, J.) (alteration, citation, and internal quotation marks omitted).

The Court granted certiorari, 580 U. S. ___ (2016), and now reverses.

## II

A fundamental principle of the First Amendment is that all persons have access to places where they can speak and listen, and then, after reflection, speak and listen once more. The Court has sought to protect the right to speak in this spatial context. A basic rule, for example, is that a street or a park is a quintessential forum for the exercise of First Amendment rights. See *Ward* v. *Rock Against Racism*, 491 U. S. 781, 796 (1989). Even in the modern era, these places are still essential venues for public gatherings to celebrate some views, to protest others, or simply to learn and inquire.

While in the past there may have been difficulty in

identifying the most important places (in a spatial sense) for the exchange of views, today the answer is clear. It is cyberspace—the "vast democratic forums of the Internet" in general, *Reno* v. *American Civil Liberties Union*, 521 U. S. 844, 868 (1997), and social media in particular. Seven in ten American adults use at least one Internet social networking service. Brief for Electronic Frontier Foundation et al. as *Amici Curiae* 5–6. One of the most popular of these sites is Facebook, the site used by petitioner leading to his conviction in this case. According to sources cited to the Court in this case, Facebook has 1.79 billion active users. *Id.,* at 6. This is about three times the population of North America.

Social media offers "relatively unlimited, low-cost capacity for communication of all kinds." *Reno*, *supra,* at 870. On Facebook, for example, users can debate religion and politics with their friends and neighbors or share vacation photos. On LinkedIn, users can look for work, advertise for employees, or review tips on entrepreneurship. And on Twitter, users can petition their elected representatives and otherwise engage with them in a direct manner. Indeed, Governors in all 50 States and almost every Member of Congress have set up accounts for this purpose. See Brief for Electronic Frontier Foundation 15–16. In short, social media users employ these websites to engage in a wide array of protected First Amendment activity on topics "as diverse as human thought." *Reno*, *supra*, at 870 (internal quotation marks omitted).

The nature of a revolution in thought can be that, in its early stages, even its participants may be unaware of it. And when awareness comes, they still may be unable to know or foresee where its changes lead. Cf. D. Hawke, Benjamin Rush: Revolutionary Gadfly 341 (1971) (quoting Rush as observing: "'The American war is over; but this is far from being the case with the American revolution. On the contrary, nothing but the first act of the great drama

is closed'"). So too here. While we now may be coming to the realization that the Cyber Age is a revolution of historic proportions, we cannot appreciate yet its full dimensions and vast potential to alter how we think, express ourselves, and define who we want to be. The forces and directions of the Internet are so new, so protean, and so far reaching that courts must be conscious that what they say today might be obsolete tomorrow.

This case is one of the first this Court has taken to address the relationship between the First Amendment and the modern Internet. As a result, the Court must exercise extreme caution before suggesting that the First Amendment provides scant protection for access to vast networks in that medium.

### III

This background informs the analysis of the North Carolina statute at issue. Even making the assumption that the statute is content neutral and thus subject to intermediate scrutiny, the provision cannot stand. In order to survive intermediate scrutiny, a law must be "narrowly tailored to serve a significant governmental interest." *McCullen* v. *Coakley*, 573 U. S. ___, ___ (2014) (slip op., at 18) (internal quotation marks omitted). In other words, the law must not "burden substantially more speech than is necessary to further the government's legitimate interests." *Id.,* at ___ (slip op., at 19) (internal quotation marks omitted).

For centuries now, inventions heralded as advances in human progress have been exploited by the criminal mind. New technologies, all too soon, can become instruments used to commit serious crimes. The railroad is one example, see M. Crichton, The Great Train Robbery, p. xv (1975), and the telephone another, see 18 U. S. C. §1343. So it will be with the Internet and social media.

There is also no doubt that, as this Court has recog-

nized, "[t]he sexual abuse of a child is a most serious crime and an act repugnant to the moral instincts of a decent people." *Ashcroft* v. *Free Speech Coalition*, 535 U. S. 234, 244 (2002). And it is clear that a legislature "may pass valid laws to protect children" and other victims of sexual assault "from abuse." See *id.,* at 245; accord, *New York* v. *Ferber*, 458 U. S. 747, 757 (1982). The government, of course, need not simply stand by and allow these evils to occur. But the assertion of a valid governmental interest "cannot, in every context, be insulated from all constitutional protections." *Stanley* v. *Georgia*, 394 U. S. 557, 563 (1969).

It is necessary to make two assumptions to resolve this case. First, given the broad wording of the North Carolina statute at issue, it might well bar access not only to commonplace social media websites but also to websites as varied as Amazon.com, Washingtonpost.com, and Webmd.com. See *post,* at 6–9; see also Brief for Electronic Frontier Foundation 24–27; Brief for Cato Institute et al. as *Amici Curiae* 10–12, and n. 6. The Court need not decide the precise scope of the statute. It is enough to assume that the law applies (as the State concedes it does) to social networking sites "as commonly understood"—that is, websites like Facebook, LinkedIn, and Twitter. See Brief for Respondent 54; Tr. of Oral Arg. 27.

Second, this opinion should not be interpreted as barring a State from enacting more specific laws than the one at issue. Specific criminal acts are not protected speech even if speech is the means for their commission. See *Brandenburg* v. *Ohio*, 395 U. S. 444, 447–449 (1969) (*per curiam*). Though the issue is not before the Court, it can be assumed that the First Amendment permits a State to enact specific, narrowly tailored laws that prohibit a sex offender from engaging in conduct that often presages a sexual crime, like contacting a minor or using a website to gather information about a minor. Cf. Brief for Respond-

ent 42–43.  Specific laws of that type must be the State's first resort to ward off the serious harm that sexual crimes inflict.  (Of importance, the troubling fact that the law imposes severe restrictions on persons who already have served their sentence and are no longer subject to the supervision of the criminal justice system is also not an issue before the Court.)

Even with these assumptions about the scope of the law and the State's interest, the statute here enacts a prohibition unprecedented in the scope of First Amendment speech it burdens.  Social media allows users to gain access to information and communicate with one another about it on any subject that might come to mind.  *Supra,* at 5.  By prohibiting sex offenders from using those websites, North Carolina with one broad stroke bars access to what for many are the principal sources for knowing current events, checking ads for employment, speaking and listening in the modern public square, and otherwise exploring the vast realms of human thought and knowledge.  These websites can provide perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard.  They allow a person with an Internet connection to "become a town crier with a voice that resonates farther than it could from any soapbox." *Reno*, 521 U. S., at 870.

In sum, to foreclose access to social media altogether is to prevent the user from engaging in the legitimate exercise of First Amendment rights.  It is unsettling to suggest that only a limited set of websites can be used even by persons who have completed their sentences.  Even convicted criminals—and in some instances especially convicted criminals—might receive legitimate benefits from these means for access to the world of ideas, in particular if they seek to reform and to pursue lawful and rewarding lives.

### IV

The primary response from the State is that the law must be this broad to serve its preventative purpose of keeping convicted sex offenders away from vulnerable victims. The State has not, however, met its burden to show that this sweeping law is necessary or legitimate to serve that purpose. See *McCullen*, 573 U. S., at \_\_\_ (slip op., at 28).

It is instructive that no case or holding of this Court has approved of a statute as broad in its reach. The closest analogy that the State has cited is *Burson* v. *Freeman*, 504 U. S. 191 (1992). There, the Court upheld a prohibition on campaigning within 100 feet of a polling place. That case gives little or no support to the State. The law in *Burson* was a limited restriction that, in a context consistent with constitutional tradition, was enacted to protect another fundamental right—the right to vote. The restrictions there were far less onerous than those the State seeks to impose here. The law in *Burson* meant only that the last few seconds before voters entered a polling place were "their own, as free from interference as possible." *Id.,* at 210. And the Court noted that, were the buffer zone larger than 100 feet, it "could effectively become an impermissible burden" under the First Amendment. *Ibid.*

The better analogy to this case is *Board of Airport Comm'rs of Los Angeles* v. *Jews for Jesus, Inc.*, 482 U. S. 569 (1987), where the Court struck down an ordinance prohibiting any "First Amendment activities" at Los Angeles International Airport because the ordinance covered all manner of protected, nondisruptive behavior including "talking and reading, or the wearing of campaign buttons or symbolic clothing," *id.,* at 571, 575. If a law prohibiting "all protected expression" at a single airport is not constitutional, *id.,* at 574 (emphasis deleted), it follows with even greater force that the State may not enact this complete bar to the exercise of First Amendment rights on

websites integral to the fabric of our modern society and culture.

\*     \*     \*

It is well established that, as a general rule, the Government "may not suppress lawful speech as the means to suppress unlawful speech." *Ashcroft* v. *Free Speech Coalition*, 535 U. S., at 255.  That is what North Carolina has done here.  Its law must be held invalid.

The judgment of the North Carolina Supreme Court is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE GORSUCH took no part in the consideration or decision of this case.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

### No. 15–1194

### LESTER GERARD PACKINGHAM, PETITIONER *v.* NORTH CAROLINA

#### ON WRIT OF CERTIORARI TO THE SUPREME COURT OF NORTH CAROLINA

#### [June 19, 2017]

JUSTICE ALITO, with whom THE CHIEF JUSTICE and JUSTICE THOMAS join, concurring in the judgment.

The North Carolina statute at issue in this case was enacted to serve an interest of "surpassing importance." *New York* v. *Ferber*, 458 U. S. 747, 757 (1982)—but it has a staggering reach. It makes it a felony for a registered sex offender simply to visit a vast array of websites, including many that appear to provide no realistic opportunity for communications that could facilitate the abuse of children. Because of the law's extraordinary breadth, I agree with the Court that it violates the Free Speech Clause of the First Amendment.

I cannot join the opinion of the Court, however, because of its undisciplined dicta. The Court is unable to resist musings that seem to equate the entirety of the internet with public streets and parks. *Ante*, at 4–5. And this language is bound to be interpreted by some to mean that the States are largely powerless to restrict even the most dangerous sexual predators from visiting any internet sites, including, for example, teenage dating sites and sites designed to permit minors to discuss personal prob-

lems with their peers. I am troubled by the implications of the Court's unnecessary rhetoric.

## I

## A

The North Carolina law at issue makes it a felony for a registered sex offender "to access a commercial social networking Web site where the sex offender knows that the site permits minor children to become members or to create or maintain personal Web pages." N. C. Gen. Stat. Ann. §§14–202.5(a), (e) (2015). And as I will explain, the statutory definition of a "commercial social networking Web site" is very broad.

Packingham and the State debate the analytical framework that governs this case. The State argues that the law in question is content neutral and merely regulates a "place" (*i.e.*, the internet) where convicted sex offenders may wish to engage in speech. See Brief for Respondent 20–25. Therefore, according to the State, the standard applicable to "time, place, or manner" restrictions should apply. See *Ward* v. *Rock Against Racism*, 491 U. S. 781, 791 (1989). Packingham responds that the challenged statute is "unlike any law this Court has considered as a time, place, or manner restriction," Brief for Petitioner 37, and he advocates a more demanding standard of review, *id.*, at 37–39.

Like the Court, I find it unnecessary to resolve this dispute because the law in question cannot satisfy the standard applicable to a content-neutral regulation of the place where speech may occur.

## B

A content-neutral "time, place, or manner" restriction must serve a "legitimate" government interest, *Ward*, *supra*, at 798, and the North Carolina law easily satisfies this requirement. As we have frequently noted, "[t]he

prevention of sexual exploitation and abuse of children constitutes a government objective of surpassing importance." *Ferber*, *supra*, at 757. "Sex offenders are a serious threat," and "the victims of sexual assault are most often juveniles." *McKune* v. *Lile*, 536 U. S. 24, 32 (2002) (plurality opinion); see *Connecticut Dept. of Public Safety* v. *Doe*, 538 U. S. 1, 4 (2003). "[T]he . . . interest [of] safeguarding the physical and psychological well-being of a minor . . . is a compelling one," *Globe Newspaper Co.* v. *Superior Court, County of Norfolk*, 457 U. S. 596, 607 (1982), and "we have sustained legislation aimed at protecting the physical and emotional well-being of youth even when the laws have operated in the sensitive area of constitutionally protected rights," *Ferber*, *supra*, at 757.

Repeat sex offenders pose an especially grave risk to children. "When convicted sex offenders reenter society, they are much more likely than any other type of offender to be rearrested for a new rape or sexual assault." *McKune*, *supra*, at 33 (plurality opinion); see *United States* v. *Kebodeaux*, 570 U. S. \_\_\_, \_\_\_–\_\_\_ (2013) (slip op., at 8–9).

The State's interest in protecting children from recidivist sex offenders plainly applies to internet use. Several factors make the internet a powerful tool for the would-be child abuser. First, children often use the internet in a way that gives offenders easy access to their personal information—by, for example, communicating with strangers and allowing sites to disclose their location.[1] Second, the internet provides previously unavailable ways

—————

[1] See Pew Research Center, Teens, Social Media, and Privacy 5 (May 21, 2013), http://www.pewinternet.org/files/2013/05/PIP_ TeensSocialMediaandPrivacy_PDF.pdf (all internet materials as last visited June 16, 2017); J. Wolak, K. Mitchell, & D. Finkelhor, National Center for Missing & Exploited Children, Online Victimization of Youth: Five Years Later 7 (2006) (prepared by Univ. of N. H., Crimes Against Children Research Center), http://www.unh.edu/ccrc/pdf/CV138.pdf.

of communicating with, stalking, and ultimately abusing children. An abuser can create a false profile that misrepresents the abuser's age and gender. The abuser can lure the minor into engaging in sexual conversations, sending explicit photos, or even meeting in person. And an abuser can use a child's location posts on the internet to determine the pattern of the child's day-to-day activities—and even the child's location at a given moment. Such uses of the internet are already well documented, both in research[2] and in reported decisions.[3]

Because protecting children from abuse is a compelling state interest and sex offenders can (and do) use the internet to engage in such abuse, it is legitimate and entirely

—————

[2] See *id.*, at 2–3; Wolak, Finkhor, Mitchell, & Ybarra, Online "Predators" and Their Victims, 63 Am. Psychologist 111, 112 (Feb.–Mar. 2008).

[3] For example, in *State* v. *Gallo*, 275 Ore. App. 868, 869, 365 P. 3d 1154, 1154–1155 (2015), a 32-year-old defendant posing as a 15-year-old boy used a social networking site to contact and befriend a 16-year-old autistic girl. "He then arranged to meet the victim, took her to a park, and sexually abused her." *Ibid.*, 365 P. 3d, at 1155. In *United States* v. Steele, 664 Fed. Appx. 260, 261 (CA3 2016), the defendant "began interacting with a minor [victim] on the gay social networking cell phone application 'Jack'd.'" He eventually met the 14-year-old victim and sexually abused him. *Ibid.* Sadly, these cases are not unique. See, *e.g.*, *Himko* v. *English*, 2016 WL 7645584, *1 (ND Fla., Dec. 5, 2016) (a convicted rapist and registered sex offender "contacted a sixteen-year-old girl using . . . Facebook" and then exchanged explicit text messages and photographs with her), report and recommendation adopted, 2017 WL 54246 (Jan. 4, 2017); *Roberts* v. *United States*, 2015 WL 7424858, *2–*3 (SD Ohio, Nov. 23, 2015) (the defendant "met a then 14-year-old child online via a social networking website called vampirefreaks.com" and then enticed the child to his home and "coerced the child to perform oral sex on him"), report and recommendation adopted, 2016 WL 112647 (Jan. 8, 2016), certificate of appealability denied, No. 16–3050 (CA6 June 15, 2016); *State* v. *Murphy*, 2016–0901, p. 3 (La. App. 1 Cir. 10/28/16), 206 So. 3d 219, 224 (a defendant "initiated conversations" with his 12-year-old victim "on a social network chat site called 'Kik'" and later sent sexually graphic photographs of himself to the victim and received sexually graphic photos from her).

reasonable for States to try to stop abuse from occurring before it happens.

## C

### 1

It is not enough, however, that the law before us is designed to serve a compelling state interest; it also must not "burden substantially more speech than is necessary to further the government's legitimate interests." *Ward*, 491 U. S., at 798–799; see also *McCullen* v. *Coakley*, 573 U. S. \_\_\_, \_\_\_–\_\_\_ (2014) (slip op., at 18–19). The North Carolina law fails this requirement.

A straightforward reading of the text of N. C. Gen. Stat. Ann. §14–202.5 compels the conclusion that it prohibits sex offenders from accessing an enormous number of websites. The law defines a "commercial social networking Web site" as one with four characteristics. First, the website must be "operated by a person who derives revenue from membership fees, advertising, or other sources related to the operation of the Web site." §14–202.5(b)(1). Due to the prevalence of advertising on websites of all types, this requirement does little to limit the statute's reach.

Second, the website must "[f]acilitat[e] the social introduction between two or more persons for the purposes of friendship, meeting other persons, or information exchanges." §14–202.5(b)(2). The term "social introduction" easily encompasses any casual exchange, and the term "information exchanges" seems to apply to any site that provides an opportunity for a visitor to post a statement or comment that may be read by other visitors. Today, a great many websites include this feature.

Third, a website must "[a]llo[w] users to create Web pages or personal profiles that contain information *such as* the name or nickname of the user, photographs placed on the personal Web page by the user, other personal infor-

mation about the user, and links to other personal Web pages on the commercial social networking Web site of friends or associates of the user that may be accessed by other users or visitors to the Web site." §14–202.5(b)(3) (emphasis added). This definition covers websites that allow users to create anything that can be called a "personal profile," *i.e.*, a short description of the user.[4] Contrary to the argument of the State, Brief for Respondent 26–27, everything that follows the phrase "such as" is an illustration of features that a covered website or personal profile may (but need not) include.

Fourth, in order to fit within the statute, a website must "[p]rovid[e] users or visitors . . . mechanisms to communicate with other users, *such as* a message board, chat room, electronic mail, or instant messenger." §14–202.5(b)(4) (emphasis added). This requirement seems to demand no more than that a website allow back-and-forth comments between users. And since a comment function is undoubtedly a "mechanis[m] to communicate with other users," *ibid.*, it appears to follow that any website with such a function satisfies this requirement.

2

The fatal problem for §14–202.5 is that its wide sweep precludes access to a large number of websites that are most unlikely to facilitate the commission of a sex crime against a child. A handful of examples illustrates this point.

Take, for example, the popular retail website Amazon.com, which allows minors to use its services[5] and

––––––––

[4] See New Oxford American Dictionary 1394 (3d ed. 2010); Webster's Third New International Dictionary 1811 (2002); 12 Oxford English Dictionary 576 (2d ed. 1989).

[5] See Amazon, Conditions of Use (June 21, 2016), https://www.amazon. com / gp / help/customer/display.html/ref=help_search_1-2?ie=UTF8& nodeId=201909000&qid=1490898710&sr=1-2.

meets all four requirements of §14–202.5's definition of a commercial social networking website. First, as a seller of products, Amazon unquestionably derives revenue from the operation of its website. Second, the Amazon site facilitates the social introduction of people for the purpose of information exchanges. When someone purchases a product on Amazon, the purchaser can review the product and upload photographs, and other buyers can then respond to the review.[6] This information exchange about products that Amazon sells undoubtedly fits within the definition in §14–202.5. It is the equivalent of passengers on a bus comparing notes about products they have purchased. Third, Amazon allows a user to create a personal profile, which is then associated with the product reviews that the user uploads. Such a profile can contain an assortment of information, including the user's name, e-mail address, and picture.[7] And fourth, given its back-and-forth comment function, Amazon satisfies the final statutory requirement.[8]

Many news websites are also covered by this definition. For example, the Washington Post's website gives minors access[9] and satisfies the four elements that define a com-

_____

[6] See Amazon, About Customer Reviews, https://www.amazon.com/gp/help/customer/display.html/ref=hp_left_v4_sib?ie=UTF8&nodeId=201967050; Amazon, About Public Activity, https://www.amazon.com/gp/help/customer/display.html/ref=hp_left_v4_sib?ie=UTF8&nodeId=202076150.

[7] See Amazon, About Your Profile, https://www.amazon.com/gp/help/customer/display.html/ref=hp_left_v4_sib?ie=UTF8&nodeId=202076210; Amazon, About Public Information, https://www.amazon.com/gp/help/customer/display.html/ref=help_search_1-2?ie=UTF8&nodeId=202076170&qid=1490835739&sr=1-2.

[8] Amazon does not appear to fall within the statute's exemption for websites that have as their "primary purpose the facilitation of commercial transactions involving goods or services between its members or visitors." §14–202.5(c)(2). Amazon's primary purpose seems to be the facilitation of commercial transactions between its users and *itself*.

[9] See Washington Post, Terms of Service (July 1, 2014), https://www.

mercial social networking website. The website (1) derives revenue from ads and (2) facilitates social introductions for the purpose of information exchanges. Users of the site can comment on articles, reply to other users' comments, and recommend another user's comment.[10] Users can also (3) create personal profiles that include a name or nickname and a photograph. The photograph and name will then appear next to every comment the user leaves on an article. Finally (4), the back-and-forth comment section is a mechanism for users to communicate among themselves. The site thus falls within §14–202.5 and is accordingly off limits for registered sex offenders in North Carolina.

Or consider WebMD—a website that contains health-related resources, from tools that help users find a doctor to information on preventative care and the symptoms associated with particular medical problems. WebMD, too, allows children on the site.[11] And it exhibits the four hallmarks of a "commercial social networking" website. It obtains revenue from advertisements.[12] It facilitates information exchanges—via message boards that allow users to engage in public discussion of an assortment of health issues.[13] It allows users to create basic profile

—————

washingtonpost.com/terms-of-service/2011/11/18/gIQAldiYiN_story.html?utm_term=.9be5851f95.

[10] See Washington Post, Ad choices (Nov. 21, 2011), https://www.washingtonpost.com/how-can-i-opt-out-of-online-advertising-cookies/2011/11/18/gIQABECbiN_story.html?utm_term=3da1f56d67e7; Washington Post, Privacy Policy (May 2, 2017), https://www.washingtonpost.com/privacy-policy/2011/11/18/gIQASIiaiN_story.html?utm_term=.8252a76f8df2.

[11] See WebMD, Terms and Conditions of Use (Nov. 2, 2016), https://www.webmd.com/about-webmd-policies/about-terms-and-conditions-of-use.

[12] WebMD, Advertising Policy (June 9, 2016), http://www.webmd.com/about-webmd-policies/about-advertising-policy.

[13] WebMD, Message Board Overview (Sept. 22, 2016), http://www.webmd.com/about-webmd-policies/about-community-overview.

pages: Users can upload a picture and some basic information about themselves, and other users can see their aggregated comments and "likes."[14] WebMD also provides message boards, which are specifically mentioned in the statute as a "mechanis[m] to communicate with other users." N. C. Gen. Stat. Ann. §14–202.5(b)(4).

As these examples illustrate, the North Carolina law has a very broad reach and covers websites that are ill suited for use in stalking or abusing children. The focus of the discussion on these sites—shopping, news, health— does not provide a convenient jumping off point for conversations that may lead to abuse. In addition, the social exchanges facilitated by these websites occur in the open, and this reduces the possibility of a child being secretly lured into an abusive situation. These websites also give sex offenders little opportunity to gather personal details about a child; the information that can be listed in a profile is limited, and the profiles are brief. What is more, none of these websites make it easy to determine a child's precise location at a given moment. For example, they do not permit photo streams (at most, a child could upload a single profile photograph), and they do not include up-to-the minute location services. Such websites would provide essentially no aid to a would-be child abuser.

Placing this set of websites categorically off limits from registered sex offenders prohibits them from receiving or engaging in speech that the First Amendment protects and does not appreciably advance the State's goal of protecting children from recidivist sex offenders. I am therefore compelled to conclude that, while the law before us addresses a critical problem, it sweeps far too broadly to satisfy the demands of the Free Speech Clause.[15]

———————

[14] See WebMD, Change Your Profile Settings (Feb. 19, 2014), http:// www.webmd.com/about-webmd-policies/profile.

[15] I express no view on whether a law that does not reach the sort of

## II

While I thus agree with the Court that the particular law at issue in this case violates the First Amendment, I am troubled by the Court's loose rhetoric. After noting that "a street or a park is a quintessential forum for the exercise of First Amendment rights," the Court states that "cyberspace" and "social media in particular" are now "the most important places (in a spatial sense) for the exchange of views." *Ante*, at 4–5. The Court declines to explain what this means with respect to free speech law, and the Court holds no more than that the North Carolina law fails the test for content-neutral "time, place, and manner" restrictions. But if the entirety of the internet or even just "social media" sites[16] are the 21st century equivalent of public streets and parks, then States may have little ability to restrict the sites that may be visited by even the most dangerous sex offenders. May a State preclude an adult previously convicted of molesting children from visiting a dating site for teenagers? Or a site where minors communicate with each other about personal problems? The Court should be more attentive to the implications of its rhetoric for, contrary to the Court's suggestion, there are important differences between cyberspace and the physical world.

I will mention a few that are relevant to internet use by sex offenders. First, it is easier for parents to monitor the physical locations that their children visit and the individuals with whom they speak in person than it is to monitor their internet use. Second, if a sex offender is seen approaching children or loitering in a place fre-

_____

sites discussed above would satisfy the First Amendment. Until such a law is before us, it is premature to address that question.

[16] As the law at issue here shows, it is not easy to provide a precise definition of a "social media" site, and the Court makes no effort to do so. Thus, the scope of its dicta is obscure.

quented by children, this conduct may be observed by parents, teachers, or others.  Third, the internet offers an unprecedented degree of anonymity and easily permits a would-be molester to assume a false identity.

The Court is correct that we should be cautious in applying our free speech precedents to the internet.  *Ante*, at 6. Cyberspace is different from the physical world, and if it is true, as the Court believes, that "we cannot appreciate yet" the "full dimensions and vast potential" of "the Cyber Age," *ibid.*, we should proceed circumspectly, taking one step at a time.  It is regrettable that the Court has not heeded its own admonition of caution.