IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

THE STATE OF WASHINGTON,     )    No. 77334-8-I
    )
    Respondent,     )
    )
    v.     )    UNPUBLISHED OPINION
    )
MILLER, SCOTT CARY,     )
    )
    Appellant.     )    FILED: April 29, 2019

SCHINDLER, J. — The State charged Scott Cary Miller with child molestation in the first degree and rape of a child in the first degree. Following a stipulated trial, the court found Miller guilty as charged. Miller submitted a sexual deviancy evaluation in support of his request for a special sex offender sentencing alternative (SSOSA). The court agreed to impose a SSOSA and suspended 77 months on child molestation in the first degree and 119 months on rape of a child in the first degree. Miller appeals the decision to revoke the SSOSA and challenges a number of community custody conditions. We affirm the decision to revoke the SSOSA. We affirm imposition of community custody conditions 11, 13, and 14 but remand to strike condition 8 and to strike or clarify conditions 6 and 15.

FACTS

In 2012, 15-year-old R.M. told a high school counselor that her father Scott Cary Miller "raped her when she was five years old." The counselor reported the sexual

assault to the police. R.M. told Everett Police Officer Karen Kowlachyk that when she was "about 4 ½ to 5" years old, Miller "would make her touch his penis." R.M. said Miller put her on his bed and "told her to grab his penis" and "rub her hand up and down." R.M. described "three or four other incidents" of sexual contact with Miller. R.M. said they were "in the bedroom" "three different times" and "one time on the couch in the living room." R.M. said on one occasion, Miller "put her mouth on his penis" and told her to "lick his penis . . . '[l]ike a lollipop.' " In a written statement, R.M. said that one time, Miller "brought a video and told me to do what the lady did" on the video.

Officer Kowlachyk interviewed Miller. Miller told Officer Kowlachyk he "wasn't going to deny the 'touching penis thing.' " Miller admitted, "[I]t happened . . . maybe 'two or three times.' " Miller "remember[ed] the time on the couch and the 'mouth part' " and "recalled one or two other times in the bedroom where he had her touch him." Miller said, "During that time, he was drinking a lot" and that he was " 'horny and frisky' " and took "advantage of an opportunity." Miller said he "made a conscious decision to stop" because "it had gone too far."

The State charged Miller with child molestation in the first degree and rape of a child in the first degree of R.M. Miller stipulated to a bench trial. On December 9, 2013, the court found Miller guilty as charged and entered findings of fact and conclusions of law.

Before sentencing, certified sex offender treatment provider Norman Glassman conducted a sexual deviancy evaluation of Miller. Miller told Glassman he was an alcoholic and he was "frequently drunk" and "using marijuana at the time he was abusing his daughter." Miller said that he "subscribed to an [I]nternet pornographic

2

website" and he "watched X-rated videos as recently as several weeks before the evaluation."

Glassman recommended the court impose a special sex offender sentencing alternative (SSOSA) and Miller obtain a substance abuse evaluation. Glassman concluded, "Mr. Miller is an opportunistic offender and has not re-offended in many years." Glassman said Miller's "issues can be addressed in treatment." Glassman recommended Miller follow all SSOSA conditions and after a substance abuse evaluation, all treatment recommendations. Glassman specifically recommended that Miller "enter and complete a weekly comprehensive sexual deviancy treatment program"; "not use any alcohol or illegal drugs during the entire treatment period"; "not buy or have in his possession any pornographic materials," including "computer and/or [I]nternet generated pornography"; "have [I]nternet access only with permission of his CCO[1] and therapist"; and "not date women who have minor children or form relationships with families who have minor children."

At the sentencing hearing on December 9, 2013, the court agreed to impose a SSOSA. The court sentenced Miller to 89 months for molestation of a child in the first degree, count 1; and 131 months for rape of a child in the first degree, count 2. The court suspended 77 months as to count 1 and 119 months on count 2. The court ordered Miller to serve 12 months and imposed a term of community custody for life.

The judgment and sentence states Miller shall undergo sex offender treatment for three years. The court imposed a number of conditions. But the court did not impose any conditions related to use of computers or the Internet.

---

[1] Community corrections officer.

After his release from jail, Miller began sex offender treatment with certified treatment provider Randy Green. On January 15, 2016, Green sent a "Treatment Violation Report" to the CCO. Green states Miller "reported pornography use" that violated two provisions of the "Treatment Contract." The two provisions of the Treatment Contract that Miller violated state:

Item Number 7) No part of a client's life is considered "private" with respect to treatment. This includes issues, feelings, thoughts, relationships, behaviors, and activities. Clients are expected to bring up anything important which has come up since the last session and to discuss major life decisions or changes in advance of making such decisions or changes.

Item Number 16) Clients must not view or possess pornography and erotic material. This includes sexually explicit computer or Internet images, pornographic magazines (both "soft" and "hard" porn), pornographic books; X-rated movies and/or videos; the Playboy channel or other sexually explicit TV[2] programs; sexually suggestive or explicit telephone services; peepshows and "adult bookstores"; and anything else which is pornographic or sexually exploitative. Client must not masturbate while watching television or use non-pornographic materials for deviant purposes.

Green stated Miller's "access to pornography was prominent in his offending behavior, and his doing so now should be recognized as an increase factor in his risk for reoffense." Green stated Miller's "continued accessing pornography is made more troubling because of the elaborate denial and avoidance with which he concealed it." However, Green concluded that "[w]hile we are saddened by revelations that he has been accessing pornography all the while, we nonetheless resist a conclusion that the treatment violation is 'fatal' . . . and only informs the path forward." Green recommended Miller "be restricted from any kind of [I]nternet access for a minimum of

---

[2] Television.

six months." On January 19, the CCO submitted a "Notice of Violation" that attached the Treatment Violation Report.

On February 5, 2016, the State filed a "Petition for Order Modifying Sentence/ Revoking Sentence/Confining Defendant" with the January 15 Treatment Violation Report and the January 19 Department of Corrections (DOC) Notice of Violation. The petition states Miller violated the conditions of his SSOSA by (1) "[f]ailing to abide by his Sex Offender Treatment contract by not being transparent about his issues, feelings[,] thoughts, relationships, behaviors, and activities" and (2) "[f]ailing to abide by his Sex Offender Treatment contract by viewing and possessing pornographic/erotic material."

At the hearing on March 7, 2016, Miller stipulated to the two violations of the SSOSA conditions. The court continued the hearing to determine whether to impose a sanction or revoke the SSOSA.

Green and the supervising CCO testified at the hearing on April 21, 2016. Green testified Miller's "risk to re-offend is low." Green said Miller "viewing pornography" is "a factor in his offending" but it does not "necessarily increase our assessment of his risk to re-offend." Green testified Miller "completed the assignments that I gave him relative to this violation . . . with the exception I think of getting [I]nternet monitoring software."

The court found Miller violated the SSOSA conditions. The court entered an order modifying the SSOSA. The court modified the SSOSA to order Miller to purchase "monitoring software" and "take all of his Internet-capable devices to 5/03/16 appointment with CCO for installation."

On December 1, 2016, Green submitted a progress report to the CCO. Green states Miller violated the terms of the treatment agreement by using "images of b[r]easts

during lactation . . . for erotic purposes." Green states that in October, Miller "requested

to cancel a few appointments, offering scarcely believable reasons for doing so, and

was still struggling to work on his treatment assignments." Green suspended treatment

in November. Green said Miller wanted "to find another treatment provider" because

Green " 'persecute[s]' him because of his Christian faith."

On December 13, the State filed a petition for an order to modify the SSOSA and

the November 30, 2016 DOC violation report. The petition states Miller did not comply

with the following six SSOSA conditions:

1. Failing to abide by Sex Offender Treatment contract by viewing non-pornographic for the purposes of sexual gratification, masturbating to "lactating breast" video on or about 11-8-16;

2. Failing to abide by Sex Offender Treatment contract by viewing or possessing pornographic and erotic materials, by viewing nude photos of "Helen Fox" on or about 11-8-16;

3. Failing to abide by Sex Offender Treatment contract by viewing or possessing pornographic and erotic materials, by viewing a pornographic website "twistynetwork.com" on or about 11-18-16;

4. Uninstalling Covenant Eyes monitoring software on his cell phone for an unknown period of time without permission on or about 11-22-16;

5. Failing to abide by Sex Offender Treatment contract by not being transparent about his issues, feelings, thoughts, relationships, behaviors, and activities since on or about October 2016; and,

6. Failing to abide by Sex Offender Treatment contract by having treatment services suspended due to failure to pay balance since on or about 11-21-16.

In January 2017, Miller entered into treatment with certified sex offender

treatment provider Gianna Leoncavallo.

At a hearing on March 16, 2017, Miller stipulated to masturbating to a lactating breast, viewing nude photographs, and uninstalling the Internet monitoring software from his cell phone.

The court found that Miller willfully violated the conditions of his SSOSA by "masturbating while looking at a breast," viewing nude photographs, uninstalling Internet monitoring software from his cell phone, failing to abide by his Treatment Contract by "not being transparent," and failing to abide by his Treatment Contract for failure to pay. The court found that Miller did not violate the conditions of his SSOSA by viewing the website "Twistynetwork.com."

As previously recommended by the SSOSA treatment provider, the court entered an order modifying the SSOSA to limit Miller's Internet access for six months:

> Internet access is prohibited until 09/13/17 @ 1:00 pm except for searches for employment, access to email, church applications, scheduling medical appointments, Spectrum, plasma donations[,] . . . to advertise wood products, [and] to set up jail visits with his son.

On July 13, 2017, Leoncavallo terminated treatment with Miller. In a letter to the CCO, Leoncavallo states Miller "has continued to be resistant, argumentative, defensive and controlling in group. I do not believe he is capable of making progress in my program at this time."

On August 10, 2017, the CCO submitted a Notice of Violation. The Notice of Violation states that on July 26, the CCO received an "Accountability Report" from Internet monitoring company Covenant Eyes. The Accountability Report showed Miller installed Facebook and Instagram applications on his phone and accessed the website Reddit.com. Covenant Eyes also flagged a YouTube website video accessed by Miller as "Highly Mature."

On August 17, 2017, the State filed a petition to modify or revoke the SSOSA and the August 10 Notice of Violation. The petition alleged Miller violated the conditions of his SSOSA by (1) "[f]ailing to enter into and successfully complete a sex offender treatment program" and (2) "[u]sing the [I]nternet contrary to court instruction."

At the revocation hearing on September 1, Miller stipulated to the violations. Miller testified he "read everything" in the Notice of Violation, as well as what the "other participants that have written information that you have read, and I can't argue with a lot of it."

Defense counsel argued the court should not revoke the SSOSA because a third treatment provider is "willing to take him on as a patient" and Miller is "amenable to treatment." Defense counsel argued there was some "confusion" and Miller believed his "six-month term on the [I]nternet access expired in June."

The court found Miller violated the conditions of his SSOSA. The court found Miller "is not at this point making satisfactory progress and he has not successfully completed" treatment. The court found, "Both treatment providers have indicated that they felt he was not making successful progress or satisfactory progress."

The court found Miller violated the conditions of the SSOSA by using the Internet "contrary to the Court's instructions." The court found that the "court order is clear. Internet access is prohibited until, and it's clear, September 13, 2017." The court noted this is not Miller's "first violation." The court stated:

> You've been here before. And I view that your violation here, in direct conflict with the order, is proof that you are not going to successfully complete treatment, because you're stubborn, you're hardheaded, and you're opinionated, and you're going to do whatever you want to do and whenever you want to do it."

The court concluded revocation of the SSOSA was the "appropriate thing to do based on the numerous violations that have occurred." The court entered an order revoking the SSOSA. The order states Miller willfully violated the terms and conditions of his SSOSA by "[f]ailing to successfully complete a sex offender treatment program" and using the Internet "contrary to court instruction." The order states Miller "failed to make satisfactory progress in treatment."

## ANALYSIS

### SSOSA Revocation

Miller contends the court improperly revoked the SSOSA based on violation of the Internet use condition that infringed on his First Amendment right to free speech, United States Constitution, amendment I.

Under the Sentencing Reform Act of 1981 (SRA), chapter 9.94A RCW, the court has the statutory authority to revoke a SSOSA if (a) the offender "violates the conditions of the suspended sentence" or (b) "the court finds that the offender is failing to make satisfactory progress in treatment." RCW 9.94A.670(11); State v. Miller, 180 Wn. App. 413, 416, 325 P.3d 230 (2014). We review community custody conditions for abuse of discretion. State v. Nguyen, 191 Wn.2d 671, 678, 425 P.3d 847 (2018); State v. Padilla, 190 Wn.2d 672, 677, 416 P.3d 712 (2018). The imposition of an unconstitutional condition is manifestly unreasonable. Nguyen, 191 Wn.2d at 678; Padilla, 190 Wn.2d at 677.

The First Amendment prohibits the government from proscribing speech or expressive conduct. Where a sentencing court interferes with a fundamental constitutional right, the condition must be reasonably necessary to accomplish the

9

essential needs of the State and public order. State v. Warren, 165 Wn.2d 17, 32, 195 P.3d 940 (2008). "[C]onditions that interfere with fundamental rights must be sensitively imposed." Warren, 165 Wn.2d at 32.

An offender's constitutional rights during community custody are subject to the infringements authorized by the SRA. State v. Ross, 129 Wn.2d 279, 287, 916 P.2d 405 (1996). A court has the statutory authority to impose crime-related prohibitions. Warren, 165 Wn.2d at 32. A "crime-related prohibition" prohibits "conduct that directly relates to the circumstances of the crime." RCW 9.94A.030(10).

Miller concedes the State has an interest in preventing him from accessing pornography because pornographic materials are "related to his crime." Miller cites Packingham v. North Carolina, ___ U.S. ___, 137 S. Ct. 1730, 198 L. Ed. 2d 273 (2017), to argue the condition limiting his use of the Internet for six months "unlawfully suppressed significantly more speech than necessary to achieve the government's interest."

In Packingham, the United States Supreme Court held that a North Carolina law that "makes it a felony for a registered sex offender 'to access a commercial social networking Web site where the sex offender knows that the site permits minor children to become members or to create or maintain personal Web pages' " violated the First Amendment because it restricted lawful speech. Packingham, 137 S. Ct. at 1733, 1738 (quoting N.C. GEN. STAT. § 14-202.5(a)).

The Supreme Court acknowledged that " '[t]he sexual abuse of a child is a most serious crime and an act repugnant to the moral instincts of a decent people' " and "a legislature 'may pass valid laws to protect children' and other victims of sexual assault

'from abuse.' " Packingham, 137 S. Ct. at 1736 (quoting Ashcroft v. Free Speech Coal., 535 U.S. 234, 244-45, 122 S. Ct. 1389, 152 L. Ed. 2d 403 (2002)). However, the Court concluded the North Carolina law that prohibits access to "websites like Facebook, LinkedIn, and Twitter" was not narrowly tailored and was "unprecedented in the scope of First Amendment speech it burdens." Packingham, 137 S. Ct. at 1737. The Court states that to "foreclose access to social media altogether is to prevent the user from engaging in the legitimate exercise of First Amendment rights." Packingham, 137 S. Ct. at 1737. The Court concluded:

> By prohibiting sex offenders from using those websites, North Carolina with one broad stroke bars access to what for many are the principal sources for knowing current events, checking ads for employment, speaking and listening in the modern public square, and otherwise exploring the vast realms of human thought and knowledge. These websites can provide perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard. They allow a person with an Internet connection to "become a town crier with a voice that resonates farther than it could from any soapbox."

Packingham, 137 S. Ct. at 1737 (quoting Reno v. Am. Civil Liberties Union, 521 U.S. 844, 870, 117 S. Ct. 2329, 138 L. Ed. 2d 874 (1997)).

Here, unlike in Packingham, the court did not foreclose Miller's access to social media altogether. The court restricted Miller's Internet access for six months after Miller violated the conditions of his SSOSA by masturbating to images of a lactating breast, viewing nude photographs of a woman, and uninstalling the Internet monitoring software. Because Miller consistently violated the conditions designed to prevent him from accessing pornographic materials, the six-month condition limiting Miller's access to the Internet but allowing him to use the Internet to search for employment, access

church applications and media, and schedule medical appointments and visits with his son was narrowly tailored and reasonably necessary.

The uncontroverted record established Miller repeatedly violated the SSOSA conditions and the six-month limitation on using the Internet to access pornography. The court did not abuse its discretion by revoking the SSOSA.

Right to Confrontation

Miller contends the court violated his right to confront and cross-examine witnesses at the revocation hearing. "The revocation of a suspended sentence is not a criminal proceeding." State v. Dahl, 139 Wn.2d 678, 683, 990 P.2d 396 (1999). In SSOSA revocation hearings, offenders are entitled to the same minimal due process rights as those afforded in probation or parole revocation hearings. Dahl, 139 Wn.2d at 683.

Minimal due process requires (a) written notice of the claimed violations, (b) disclosure to the defendant of the evidence against him, (c) the opportunity to be heard in person and to present witnesses and documentary evidence, (d) the right to confront and cross-examine witnesses (unless there is good cause for not allowing confrontation), (e) a neutral and detached hearing body, and (f) a written statement by the court as to the evidence relied upon and the reasons for the revocation. Morrissey v. Brewer, 408 U.S. 471, 488-89, 92 S. Ct. 2593, 33 L. Ed. 2d 484 (1972). "Courts have limited the right to confrontation afforded during revocation proceedings by admitting substitutes for live testimony, such as reports, affidavits and documentary evidence." Dahl, 139 Wn.2d at 686. The court may consider hearsay evidence if there is "good cause to forego live testimony." Dahl, 139 Wn.2d at 686.

12

Miller contends the court abused its discretion by admitting treatment provider Leoncavallo's letter terminating his treatment and the CCO's testimony that Leoncavallo told him Miller "wasn't making progress" and was using "spirituality as a crutch."

At the hearing, Miller testified that he struggled in treatment because it was "a very confrontational environment" and "an environment that's not friendly to hear, oh, I read in the Bible this or that; that wasn't received well." Miller testified that he is "stubborn" and "hardheaded" because of "God and Jesus Christ in my life that has given me a spirit, a fear for the system and fear of God to tell the truth and to be honest."

The CCO testified:

> So when I spoke with the treatment provider, [Leoncavallo], the things that she kind of pointed to me in group why he wasn't making progress is because of many of the things that Mr. Miller spoke about to you, being hardheaded, being argumentative, and one of the things that she specifically spoke on was spirituality. That he would use spirituality as a crutch and not use SOTP[3] treatment. And so he would not go through what she wanted him and he wanted to use religion as specifically his treatment.

Even if admission of the hearsay statements was error, the error was harmless. Dahl, 139 Wn.2d at 688 ("Violations of a defendant's minimal due process right to confrontation are subject to harmless error analysis."). There is no dispute that Miller failed to successfully complete a sex offender treatment program with either Green or Leoncavallo. Miller stipulated that he violated the SSOSA by failing to "successfully complete" a sex offender treatment program and admitted that he was terminated from the two treatment programs.

---

[3] Sex offender treatment program.

Community Custody Conditions

Miller challenges imposition of the following six community custody conditions:

6.     Do not frequent areas where minor children are known to congregate, as defined by the supervising Community Corrections Officer.

. . . .

8.     Do not date women as directed by the supervising Community Corrections Officer.  Mr. Miller may continue his current relationship with his wife, Marjorie Miller, and his other children . . . .

. . . .

11.    Do not . . . frequent establishments where alcohol is the chief commodity for sale.

. . . .

13.    Do not associate with known users or sellers of illegal drugs.

14.    Do not possess drug paraphernalia.

15.    Stay out of drug areas, as defined in writing by the supervising Community Corrections Officer.

Miller contends the court exceeded the statutory authority to impose the conditions because the conditions are unconstitutionally vague.

"The Fourteenth Amendment to the United States Constitution along with article I, section 3 of the Washington State Constitution require that citizens be afforded fair warning of proscribed conduct." Nguyen, 191 Wn.2d at 678.  A community custody condition is unconstitutionally vague if (1) it does not sufficiently define the proscribed conduct so an ordinary person can understand the prohibition or (2) it does not provide sufficiently ascertainable standards to protect against arbitrary enforcement. State v. Bahl, 164 Wn.2d 739, 752-53, 193 P.3d 678 (2008) (citing City of Spokane v. Douglass,

115 Wn.2d 171, 178, 795 P.2d 693 (1990)). But " 'a community custody condition is not unconstitutionally vague merely because a person cannot predict with complete certainty the exact point at which his actions would be classified as prohibited conduct.' " State v. Sanchez Valencia, 169 Wn.2d 782, 793, 239 P.3d 1059 (2010)[4] (quoting State v. Sanchez Valencia, 148 Wn. App. 302, 321, 198 P.3d 1065 (2009), rev'd, 169 Wn.2d 782). In determining whether a term is unconstitutionally vague, "the terms are not considered in a 'vacuum,' rather, they are considered in the context in which they are used." Bahl, 164 Wn.2d at 754. "When a statute does not define a term, the court may consider the plain and ordinary meaning as set forth in a standard dictionary." Bahl, 164 Wn.2d at 754.

Miller contends condition 11 that prohibits him from frequenting establishments where alcohol is the "chief commodity for sale" is unconstitutionally vague because a reasonable person would not know what "the term 'chief commodity' means" and the condition is subject to arbitrary enforcement. We disagree. The dictionary defines "chief" as "marked by greatest importance, significance, influence" and defines "commodity" as "an economic good." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 387, 458 (2002). An establishment where "alcohol is the chief commodity for sale" is an establishment where alcohol is the most important good for sale or whose primary purpose is the sale of alcohol. Because an ordinary person would understand the prohibition, condition 11 is not unconstitutionally vague.

Miller contends condition 13 that prohibits him from associating with "known users or sellers of illegal drugs" is unconstitutionally vague because it is unclear who

---

[4] Internal quotation marks omitted.

must have knowledge that a person is a "known" user or seller of illegal drugs. In In re Personal Restraint of Brettell, 6 Wn. App. 2d 161, 169, 430 P.3d 677 (2018), we considered and rejected the same argument. We held Washington case law does not support the conclusion that " 'known,' when used in a community custody condition, refers to the knowledge of anyone other than the offender." Brettell, 6 Wn. App. 2d at 169; see also United States v. Vega, 545 F.3d 743, 749-50 (9th Cir. 2008) (condition prohibiting association with " 'any member of any criminal street gang' " limited to people "known" by the defendant to be gang members). Because the condition prohibits association with people known by Miller to be users or sellers of illegal drugs, condition 13 is not unconstitutionally vague.

Citing Sanchez Valencia, 169 Wn.2d 782, Miller argues condition 14 that prohibits possession of "drug paraphernalia" is unconstitutionally vague. We disagree. In Sanchez Valencia, the Washington Supreme Court concluded a condition prohibiting " 'any paraphernalia' " generally, rather than "drug paraphernalia," was unconstitutionally vague. Sanchez Valencia, 169 Wn.2d at 794. Here, unlike in Sanchez Valencia, condition 14 specifically prohibits possession of "drug paraphernalia." RCW 69.50.102(a) defines "drug paraphernalia" as follows:

> [A]ll equipment, products, and materials of any kind which are used, intended for use, or designed for use in planting, propagating, cultivating, growing, harvesting, manufacturing, compounding, converting, producing, processing, preparing, testing, analyzing, packaging, repackaging, storing, containing, concealing, injecting, ingesting, inhaling, or otherwise introducing into the human body a controlled substance.

Miller contends conditions 6 and 15 that prohibit him from frequenting areas where minors congregate or drug areas as defined by the supervising CCO are unconstitutionally vague. The State concedes that the superior court should either

clarify or strike these conditions. We accept the concession as well taken. See State v. Irwin, 191 Wn. App. 644, 655, 364 P.3d 830 (2015) (requiring "clarifying language or an illustrative list of prohibited locations"). We remand to clarify or strike conditions 6 and 15.

Miller contends condition 8 that prohibits him from "dat[ing] women as directed by the supervising Community Corrections Officer" is vague and infringes on his fundamental right to marry. The right to marry is a fundamental right. Loving v. Virginia, 388 U.S. 1, 12, 87 S. Ct. 1817, 18 L. Ed. 2d 1010 (1967). Any condition affecting a fundamental right must be narrowly drawn after deciding that no reasonable alternative exists to achieve the State's interest. Warren, 165 Wn.2d at 34-35.

There is no dispute that where the crime involves a sexual act against a child with whom the defendant has contact through a parental relationship or "social relationship with their parents," the court may impose a community custody condition directing the offender to refrain from dating women who have minor children. State v. Kinzle, 181 Wn. App. 774, 785, 326 P.3d 870 (2014); see also State v. Autrey, 136 Wn. App. 460, 465, 468, 150 P.3d 580 (2006) (affirming condition requiring "prior approval" of therapist and CCO before engaging in sexual contact because "the offender's freedom of choosing even adult sexual partners is reasonably related to the[ ] crimes because potential romantic partners may be responsible for the safety of live-in or visiting minors"). Such a condition does not improperly infringe on the fundamental right to marry. Kinzle, 181 Wn. App. at 785.

But here, unlike in Kinzle, the condition states Miller shall "not date women as directed by the supervising Community Corrections Officer." Because condition 8

prohibits Miller from dating any women subject to the discretion of his CCO, the condition implicates the fundamental right to marry and is not narrowly drawn. We remand to strike the condition without prejudice to imposing a narrowly drawn condition that prohibits Miller from dating women who have minor children.

We affirm the decision to revoke the SSOSA. We affirm imposition of community custody conditions 11, 13, and 14. We remand to strike condition 8 and to strike or clarify conditions 6 and 15.

WE CONCUR: