19-2119-cr
*United States v. Thomas Alonzo Bolin*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term, 2019

(Argued: May 19, 2020    Decided: September 24, 2020)

Docket No. 19-2119

———————————————

UNITED STATES OF AMERICA,
*Appellee,*

v.

THOMAS ALONZO BOLIN, AKA PETER VINCENT,
*Defendant-Appellant.*

———————————————

Before:      SACK, WESLEY, and CHIN, *Circuit Judges.*

Defendant-appellant Thomas Alonzo Bolin appeals the supervised release portion of his July 3, 2019, judgment of conviction in the United States District Court for the Western District of New York (David G. Larimer, *Judge*).  He was convicted of making a materially false, fictitious, and fraudulent statement and representation to FBI agents in violation of 18 U.S.C. § 1001(a)(2).  On appeal, he challenges two of the special conditions of supervised release imposed by the district court.  The first prohibits him from posting on, or uploading to, any internet website, "or transmit[ting], by any electronic means," a statement that "promotes or endorses violence."  App'x at 122.  The second prohibits him from

using or possessing a computer or other internet-capable device without participating in a monitoring program operated by the U.S. Probation Office. Bolin asserts that neither condition is "reasonably related" to his crime of conviction and therefore that both conditions run afoul of the provision of the United States Sentencing Guidelines — section 5D1.3(b)(1) — that governs a court's imposition of discretionary conditions of supervised release. Bolin also argues that the first condition unduly infringes upon his First Amendment right to freedom of speech. We reject Bolin's first argument, concluding that both challenged conditions of Bolin's supervised release satisfy the "reasonably related" requirements of section 5D1.3(b)(1) and accord with our caselaw interpreting that provision. With respect to Bolin's second argument, however, we conclude that because of the vagueness of the condition prohibiting him from engaging in violence-promoting speech online in its present form, it infringes upon his rights to free speech guaranteed by the First Amendment to the U.S. Constitution. Accordingly, the judgment of the district court is:

AFFIRMED IN PART; VACATED AND REMANDED IN PART.

> TIFFANY H. LEE, Assistant United States Attorney, *for* James P. Kennedy Jr., United States Attorney for the Western District of New York;

2

JAY S. OVSIOVITCH, Federal Public Defender's Office, Western District of New York, *for Defendant-Appellant*.

SACK, *Circuit Judge*:

On March 12, 2019, the defendant-appellant, Thomas Alonzo Bolin, uploaded to Facebook a photograph of himself wearing a red devil mask and pointing the barrel of a shotgun at the camera. He was living in the Rochester suburb of Greece, New York at the time. Three days later, and thousands of miles away, a gunman in Christchurch, New Zealand, attacked two mosques, killing 50 people and injuring dozens of others. Minutes before the attacks, the gunman distributed online a manifesto he had written expressing racist, anti-immigrant, and white-supremacist sentiments. During the attacks, the gunman used a small camera strapped to his head to livestream the atrocities via his Facebook account. The manifesto and video quickly spread on social media websites around the world to Bolin in Western New York.

After reviewing the manifesto, Bolin used his own Facebook account to express support for the gunman's actions. He posted, among other things, anti-Semitic, anti-Muslim, and racist statements, and sent messages conveying similar

sentiments to members of a white supremacist Facebook group that he administered.

On March 17, 2019, the Federal Bureau of Investigation ("FBI") obtained records related to Bolin's Facebook account. An FBI Joint Terrorism Task Force[1] based in Rochester, New York, began investigating Bolin and other members of his Facebook group for possible violations of federal civil rights and firearms laws. As part of the investigation, on March 30, three members of the Task Force — including one FBI agent and two other Task Force officers — interviewed Bolin outside of his girlfriend's house in another Rochester suburb, Irondequoit. They warned him that it was a federal crime to lie to FBI agents during the course of an investigation. He nonetheless falsely told them that he did not possess a gun when in fact he kept a Mossberg 12-gauge shotgun in his bedroom closet. The Task Force members also interviewed Bolin's girlfriend and learned from her the address of the house in Greece, New York where Bolin boarded.

Later that day, members of the Task Force drove to Bolin's Greece address, where they obtained the permission of his landlord to search his room. Their

---

[1] FBI Special Agent Adam Paradowski, a member of the Task Force, described it as "a team of federal, state, and local law enforcement agents and officers on investigations relating to domestic and international terrorism." Paradowski Affidavit dated April 3, 2019, ¶ 1, App'x at 7.

search uncovered Bolin's devil mask, his shotgun, and shotgun ammunition. Bolin was arrested and jailed, and a criminal information was filed against him in the United States District Court for the Western District of New York. A month or so later, in May 2019, Bolin pled guilty to the information's single charge of making a materially false, fictitious, and fraudulent statement and representation to FBI agents, in violation of 18 U.S.C. § 1001(a)(2). In July, the district court (David G. Larimer, *Judge*) sentenced him to time served and three years of supervised release. His term of supervised release included four special conditions.

On appeal, Bolin challenges two of those conditions. They prohibit him from, respectively, (a) engaging in conduct online that "promotes or endorses violence"; and (b) possessing or using a computer or other internet-capable device without participating in a monitoring program operated by the U.S. Probation Office. App'x at 122. He seeks vacatur of both conditions on the ground that neither is "reasonably related" to his crime of conviction and that they therefore both violate section 5D1.3(b)(1) of the United States Sentencing Guidelines (the "U.S.S.G."), the provision that governs a court's imposition of discretionary conditions of supervised release. In addition, Bolin argues that the first condition infringes upon his First Amendment right to freedom of speech.

For the reasons set forth below, we conclude that the challenged conditions are sufficiently related to his crime of conviction under U.S.S.G. § 5D1.3(b)(1).[2] We also conclude, however, that as a result of its vagueness, the condition prohibiting Bolin from engaging in violence-promoting speech online infringes his First Amendment right of free speech. We therefore affirm all portions of the district court's judgment save for that which imposes the faulty condition of supervised release, and vacate and remand the judgment, allowing on remand the imposition of conditions permissible under this opinion.

---

[2] The required relationship is set forth in section 5D1.3(b)(1) as follows:

> The court may impose other conditions of supervised release to the extent that such conditions (1) are reasonably related to (A) the nature and circumstances of the offense and the history and characteristics of the defendant; (B) the need for the sentence imposed to afford adequate deterrence to criminal conduct; (C) the need to protect the public from further crimes of the defendant; and (D) the need to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

## BACKGROUND

*Factual Background*

The following facts are taken from a joint statement contained in the plea agreement in this case, subscribed to in full by both Bolin and the government.[3]

In 2019, Bolin, then twenty-two years old, lived in the Rochester suburb of Greece, New York. At the time, he operated a Facebook account under the alias of Peter Vincent.[4] Bolin's account belonged to several Facebook groups whose members frequently expressed support for white supremacist ideology. Bolin administered one such group called Odin's Warriors.[5]

On March 12, 2019, Bolin posted to Facebook a photograph of himself pointing a shotgun at the camera while wearing a red devil mask. Three days later, a gunman thousands of miles away attacked two mosques in Christchurch,

---

[3] The statement in its original form, *United States v. Bolin*, No. 19-06072-DGL, (W.D.N.Y. May 14, 2019), Plea Agreement, ¶ 4, ECF No. 10 at 2–4; is attached as an appendix to this opinion.

[4] Peter Vincent is apparently the name of a character from the 1985 American horror film "Fright Night." *United States v. Bolin*, No. 19-06072-DGL, (W.D.N.Y. Apr. 3, 2019), Criminal Complaint, ECF No. 1 at 4 n.1; *see also* "Fright Night," *IMDB*, *https://www.imdb.com/title/tt0089175/* (last visited 09/22/2020).

[5] Bolin purports to be a practitioner of the pagan religion of Odinism. App'x at 9. Bolin belongs to a particular sect of the religion called Folk Odinism, which believes that the faith should be off-limits to those who are not both heterosexual and white. *Id.*

New Zealand, killing 50 people and injuring dozens of others.  Minutes before the attacks, the gunman emailed to media outlets and public officials a manifesto he had written entitled "The Great Replacement," a reference to a conspiracy theory according to which white people face the risk of genocide.  Using a camera strapped to his head, the gunman also livestreamed video of the attacks to his Facebook page.

The manifesto and video quickly spread on social-media websites around the world.  Bolin read the manifesto and then posted a message on his own Facebook page:  "As a people we must accept the old gods and rally around our kin.  And fight back against the kikes.islamic filth and the niggers in that order." *United States v. Bolin*, No. 19-06072-DGL, (W.D.N.Y. May 14, 2019), Plea Agreement, ECF No. 10 at 3, App'x at 23.  He also posted two photographs — the first, captioned "how muslims see white people," depicted a white man pointing a shotgun at the camera; the second, captioned "how white people see muslims," showed a still image from the gunman's video in which a long gun is pointed downrange toward a mosque. *Id.*  And on Facebook messenger, Bolin told his girlfriend, in reference to the attacks, that "they are muslim rats they would gladly

8

do the worse to you or me. it does my hart [sic] good to see thim [sic] run down infront [sic] of their sandnigger [sic] god." *Id.*

Bolin also exchanged similar Facebook messages that day with his friend Austin Witkowski, a fellow member of the Odin's Warriors group who used the alias Ragnar Odinson on his account.[6] Again referencing the attacks, Bolin wrote to Witkowksi that the gunman "killed 40 muslims." *Id*. Witkowski responded, "Lovely," and sent Bolin an emoji of a heart. *Id*.

Witkowski then shared the gunman's manifesto and video with other members of Odin's Warriors. He also made statements on his own Facebook account calling for a re-enactment of the attacks and indicating that he would be willing to "do something" the following week. *Id.* at 2.

On March 17, after obtaining records of Bolin's Facebook posts, an FBI Joint Terrorism Task Force based in Rochester, New York began investigating Bolin, Witkowski, and other members of Odin's Warriors for possible violations of federal civil rights and firearms laws. On March 30, as part of the investigation, three Task Force members interviewed Bolin in a Task Force vehicle outside of his

---

[6] Witkowski is described as Bolin's cousin throughout the record; Bolin's brief, however, states that the men are not related and are friends. Appellant's Br. at 11 n.1.

girlfriend's house. They advised Bolin that he was not under arrest and, on at least two occasions, informed him that it was a federal crime to lie to FBI agents in the course of their investigation.

At some point during the interview, the Task Force members asked Bolin whether he possessed a firearm. Bolin answered that he had previously possessed guns while living in Kansas City but had never done so while living in New York.

The Task Force members interviewed Bolin's girlfriend the same day. She gave them an address in Greece, New York, where Bolin boarded and kept his belongings. The Task Force members then went to the Greece address where they spoke with the residence's owner. The owner informed them that she had been renting a room to Bolin for the previous eight months. She told them that she had a key to Bolin's room and that she and Bolin had an understanding that she could enter his room whenever she needed to. She provided written consent for the Task Force members to search Bolin's room and an attached storage closet; they did so shortly thereafter. The search uncovered, among other things, the red devil facemask, a Mossberg 12-gauge shotgun, and two boxes of 12-gauge shotgun ammunition.

*Procedural History*

10

On April 4, 2019, Bolin was arrested by members of the Task Force. On May 14, he was charged by information in the United States District Court for the Western District of New York with one count of:

> [K]nowingly and willfully mak[ing] a materially false, fictitious and fraudulent statement and representation, that is . . . stat[ing] to a Special Agent and Task Force Officers of the Federal Bureau of Investigation that he did not possess any firearms in New York State, whereas in truth and in fact, and as [he] then and there well knew, he was in possession of a Mossberg, Model 590, 12-gauge shotgun, bearing serial number V0853179, in his bedroom closet at 34 Third Avenue, Greece, New York. All in violation of Title 18, United States Code, Section 100l(a)(2).

*United States v. Bolin*, No. 19-06072-DGL, (W.D.N.Y. May 14, 2019), Information, ECF No. 9 at 1, App'x at 19. The same day, he entered into a plea agreement with the government and entered a plea of guilty in the district court.

On May 31, the United States Probation Office prepared a Presentence Investigation Report ("PSR") that, among other things, proposed several special conditions of supervised release. Bolin objected to three of them: (1) a requirement that he participate in a computer and internet monitoring program; (2) a prohibition on associating with any known white supremacists or those affiliated with white supremacists; and (3) a prohibition on maintaining or creating an account on any social networking website.

11

On June 24, the Probation Office issued a revised PSR that removed the conditions prohibiting Bolin from associating with white supremacists and maintaining a social networking account. On June 26, the district court contacted the parties to propose an additional special condition. The court, Bolin, and the government each referred to that condition as "Condition 3." As originally proposed, it read:

> The defendant shall not: post on, or upload to, any Internet website; or transmit, by any electronic means, including but not limited to email and text messaging, and regardless of whether it is accessible by one or more than one person, any statements or other content, whether verbal, pictorial, or otherwise, that promotes or endorses violence, unlawful activity, or any groups that espouse such ideas. That includes forwarding, "liking," or otherwise endorsing such content posted or transmitted by others, in a way that is visible to others or that would tend to further disseminate such messages or content.

> The defendant shall not post any messages, photographs, or other content, on any website that promotes or endorses violence or unlawful activity, or that is maintained by an individual or group that publicly promotes or endorses violence or unlawful activity, regardless of the nature of the message or content.

*United States v. Bolin*, No. 19-06072-DGL, (W.D.N.Y. June 28, 2019), Reply to Court's Proposed Conditions of Supervised Release, ECF No. 27 at 2.

12

On June 28, the district court, by email, proposed an additional special condition of release, referred to by the court and the parties as "Condition 4." It read:

> The defendant shall not use or possess any computer, data storage device or any internet-capable device, unless the defendant participates in the com[p]uter and internet monitoring program (CIMP), [or] unless authorized by the Court or the U.S. Probation Office. Defendant must provide the U.S. probation office advance notification of any computers, automated services or connected devices that will be used during the term of supervision. The U.S. Probation Office is authorized to install any application as necessary to surveil all activity on computers or connected devices, owned or operated by defendant. The U.S. probation office shall be notified by electronic transmission of impermissible/suspicious activity that appears to violate special condition number 3. Such activity shall be promptly brought to the Court's attention.
>
> As triggered by impermissible/suspicious activity, the defendant shall consent to and cooperate with unannounced examinations of any computer equipment owned or used by the defendant. This examination shall include, but is not limited to retrieval and copying of all data from the computers, connected devices, storage media and any internal or external peripherals and may involve removal of such equipment for the purpose of conducting a more thorough inspection. Any such monitoring examination shall be designed to avoid, as much as possible, reading any privileged information or any private material that is not illegal or in violation of condition 3. (This condition serves the statutory sentencing purpose of deterrence, public protection, and rehabilitation).

Tr. of July 2, 2019, Sentencing Hrg. at 41:2–42:5, App'x at 111–12.

Later that day, Bolin's attorney submitted a memorandum to the court objecting to Conditions 3 and 4. Counsel argued that because of the vagueness of Condition 3's terms, it infringed upon Bolin's First Amendment free speech rights. Counsel also argued that Condition 4's relationship with Bolin's crime of conviction was too attenuated to meet the requirements of the United States Sentencing Guidelines and our caselaw interpreting them.

On July 2, almost three months after his arrest — during which time he had remained incarcerated — Bolin was sentenced to a term of time served plus three years of supervised release. Bolin's counsel reiterated her objections to the court's proposed special conditions of supervised release.

During an extended colloquy regarding Condition 3, the court remarked that the condition was intended to "make sure that [] Bolin's misguided views . . . don't encourage . . . others of like thought [to] engage in violence." Tr. of July 2, 2019, Sentencing Hrg. at 15:6–9, App'x at 85. After additional discussion, the court "propose[d]" to "define violence" as a "way to perhaps make [the condition] more specific." *Id.* at 21:8–10, App'x at 91. The court continued: The condition could "say th[at] violence includes violence against persons because of their membership in a certain social group or race. It's bias-motivated violence or

14

criminal activity." *Id*. at 21:10–13, App'x at 91. Despite Bolin's counsel's continued objection, the court decided to "insert" that language after the draft condition's first sentence. *Id.* at 40:10, App'x at 110. In full, therefore, Condition 3 provided (and continues to provide) that:

> The defendant shall not: post on, or upload to, any Internet website; or transmit, by any electronic means, including but not limited to email and text messaging, and regardless of whether it is accessible by one or more than one person, any statements or other content, whether verbal, pictorial, or otherwise, that promotes or endorses violence, unlawful activity, or any groups that espouse such ideas. Violence includes: violence against persons because of their membership in a certain social group or race, bias related violence or criminal conduct. That includes forwarding, "liking," or otherwise endorsing such content posted or transmitted by others, in a way that is visible to others or that would tend to further disseminate such messages or content. The defendant shall not post *any* messages, photographs, or other content, on any website that promotes or endorses violence or unlawful activity, or that is maintained by an individual or group that publicly promotes or endorses violence or unlawful activity, regardless of the nature of the message or content.

*United States v. Bolin*, No. 19-06072-DGL, (W.D.N.Y. July 3, 2019), Judgment, ECF No. 29 at 5, App'x at 122.

Bolin's counsel also objected to Condition 4. She argued that it was "completely unrelated to the crime of [Bolin's] conviction" inasmuch as the crime — making a false statement to the FBI regarding possession of a gun — "ha[d] nothing to do with a computer." Tr. of July 2, 2019 Sentencing Hearing at 12–13,

15

App'x at 82–83. The court overruled the objection and imposed the condition as originally proposed, save for minor stylistic edits.

The following day, the court entered judgment against Bolin. This appeal followed.

## DISCUSSION

On appeal, Bolin seeks vacatur of Conditions 3 and 4 of his supervised release. In sum, as noted above, he asserts that Conditions 3 and 4 are not "reasonably related" to the conduct underlying his conviction and therefore violate provisions of the United States Sentencing Guidelines and United States Code and our caselaw interpreting those provisions. He also argues that because of the vagueness of its terms, Condition 3 violates his First Amendment right to freedom of speech.

### A. *Connection Between Conditions and the Crime of Conviction*

#### 1. *Legal Standards*

##### a. *Sentencing Guidelines*

Section 5D1.3(b)(1) of the U.S.S.G. provides that special conditions of supervised release must be "reasonably related" to:

(A) the nature and circumstances of the offense and the history and characteristics of the defendant; (B) the need for the sentence imposed

16

to afford adequate deterrence to criminal conduct; (C) the need to protect the public from further crimes of the defendant; and (D) the need to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

U.S.S.G. § 5D1.3(b)(1); *accord United States v. Myers*, 426 F.3d 117, 124 (2d Cir. 2005).

"Despite [section 5D1.3(b)(1)'s] use of the conjunctive . . . , [however], a condition may be imposed if it is reasonably related to any one or more of the [four] specified factors." *United States v. Brown*, 402 F.3d 133, 137 (2d Cir. 2005) (internal quotation marks and citation omitted).

"[S]entencing courts have 'broad discretion to tailor conditions of supervised release to the goals and purposes outlined in [U.S.S.G.] § 5D1.3(b).'" *United States v. Amer*, 110 F.3d 873, 883 (2d Cir. 1997) (quoting *United States v. Abrar*, 58 F.3d 43, 46–47 (2d Cir. 1995)). "The district court's broad discretion is not 'untrammelled,' however, and our Court 'will carefully scrutinize unusual and severe conditions.'" *Myers*, 426 F.3d at 124 (internal citation omitted) (first quoting *Abrar*, 58 F.3d at 47; and then quoting *United States v. Sofsky*, 287 F.3d 122, 126 (2d Cir. 2002)).

Section 5D1.3(b)(2) of the Guidelines requires that a special condition of supervised release must also "involve no greater deprivation of liberty than is

reasonably necessary for the purposes" of sentencing, and be "consistent with any pertinent policy statements" in the Guidelines. U.S.S.G. § 5D1.3(b)(2). "If the liberty interest at stake is fundamental, a deprivation of that liberty is 'reasonably necessary' only if the deprivation is narrowly tailored to serve a compelling government interest." *Myers*, 426 F.3d at 126.

### b. *United States Code*

In addition to the Guidelines, various sections of the U.S. Code provide standards regarding the imposition of conditions of supervised release.

First, 18 U.S.C. § 3553, "Imposition of a sentence," applies to all criminal sentences. It reads in relevant part:

> (a) Factors To Be Considered in Imposing a Sentence.—The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider—
>
> > (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> >
> > (2) the need for the sentence imposed—
> >
> > > (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> > >
> > > (B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

Second, 18 U.S.C. § 3583(d), "Inclusion of a term of supervised release after imprisonment," provides in pertinent part:

The court may order . . . a . . . condition of supervised release, to the extent that such condition—

(1) is reasonably related to the factors set forth in section 3553(a)(1), (a)(2)(B), (a)(2)(C), and (a)(2)(D);

(2) involves no greater deprivation of liberty than is reasonably necessary for the purposes set forth in section 3553(a)(2)(B), (a)(2)(C), and (a)(2)(D); and

(3) is consistent with any pertinent policy statements issued by the Sentencing Commission pursuant to 28 U.S.C. 994(a);

any condition set forth as a discretionary condition of probation in section 3563(b) and any other condition it considers to be appropriate . . .

## 2. *Analysis*

Bolin argues that "there is not a sufficient connection between" Conditions 3 and 4 and his "offense of making a materially false statement." Appellant's Br. at 38. He therefore seeks vacatur of both conditions as violating the portions of the

U.S.S.G. and U.S. Code quoted above which address special conditions of supervised release, as well as our precedent interpreting those provisions. We disagree and therefore decline to vacate either condition on this ground.

### a. *Condition 3*

The relation between Condition 3 and Bolin's crime of conviction, albeit somewhat attenuated, is sufficient. He was convicted of a single count of making a materially false, fictitious, and fraudulent statement and representation to FBI agents, in violation of 18 U.S.C. § 1001(a)(2). The scope of the statement's falsity is narrow: Bolin claimed not to possess a firearm despite knowingly storing a shotgun in the closet of his rented room. Although not directly related one to the other, viewing Bolin's behavior as a series of events that resulted in his making the false statement for which he was convicted reveals substantial connection between the two.

Bolin's online activity in praise of a mass-murderer whose ideology of white supremacist hatred he professed to share; his support for "figh[ting] back against the kikes.islamic filth and the niggers in that order"; and his posting of a photograph of himself wearing a red devil mask and pointing a shotgun barrel at the camera, all led to the FBI investigation of his activity to address the possible

20

threat of impending violence in violation of "federal civil rights laws (including 18 U.S.C. §§ 241 (conspiracy to violate civil rights), 247 (obstruction of persons in the free exercise of religious beliefs)), and firearms laws (including 18 U.S.C. § 924(c) (possession and use of firearms in furtherance of a crime of violence))." *United States v. Bolin*, No. 19-06072-DGL, (W.D.N.Y. May 14, 2019), Plea Agreement, ECF No. 10 at 3; App'x at 23. It was that threatening online speech which led to the FBI's concern about his possible possession of firearms.[7] And that concern in turn led to the Task Force interrogation in which the false statement which constituted his crime of conviction was uttered. The connection between the hate speech which led to the crime and the crime itself was thus substantial, warranting conditions of supervised release limiting either or both.

---

[7] As the district court put it:

> I would disagree with [Bolin's] counsel that [Condition 3] is unrelated to the crime before the Court. I think she's reading the crime of conviction, that being the lie to the FBI, too narrowly and is actually reading that in a vacuum. Because what brought [the FBI] to the doorstep of Mr. Bolin on March 30th of this year was his online activity and his association with someone who was endorsing and inciting others to engage in violence. So I think that's perfectly permissible.

Tr. of July 2, 2019, Sentencing Hrg. at 26:17–25, App'x at 96.

Decisions of courts in other circuits support this conclusion. In *United States v. Ross*, 476 F.3d 719 (9th Cir. 2007), the Ninth Circuit upheld a "special condition of supervised release that [the defendant] refrain from associating with known neo-Nazi/white supremacist members and affiliates and from possessing neo-Nazi/white supremacist paraphernalia," *id.* at 721. The defendant had been "passing out flyers produced by The National Alliance, a neo-Nazi/white supremacist organization that advocates race hatred, anti-Semitism, and the overthrow of the United States government." *Id.* at 720. He was convicted on a "charge of making a false statement regarding the acquisition of a firearm on which [he] entered a guilty plea." *Id.* at 721. The court concluded that the condition was reasonably related to the defendant's rehabilitation and to protection of the public. It "ha[d] no difficulty understanding from the record why the district judge believed that the interests of rehabilitation and public safety would be served by separating [the defendant] from neo-Nazi/white supremacist influences." *Id.* at 722.

In *United States v. Showalter*, 933 F.2d 573 (7th Cir. 1991), the defendant, who "pleaded guilty to possession of an unregistered firearm — a Remington Wingmaster .12 gauge sawed-off shotgun with an obliterated serial number," *id.*

22

at 574 (internal quotation marks omitted), was involved with a white supremacist "skinhead" and "neo-Nazi" group, *id.* The Seventh Circuit affirmed a condition restricting him from participating in, or associating with, those who participate in a skinhead or neo-Nazi organization. *Id.* The court justified the restriction on the grounds that the defendant "needs to be separated from other members of white supremacist groups to have a chance of staying out of trouble." *Id.* at 576.

And in *Malone v. United States*, 502 F.2d 554, 555 (9th Cir. 1974), a case involving a defendant convicted of unlawfully exporting firearms from the United States to the United Kingdom, the Ninth Circuit rejected a petition under 28 U.S.C. § 2255 for relief from conditions of federal probation prohibiting the defendant from belonging to or participating in any American Irish Republican movement, any Irish or Irish Catholic organization, from visiting any Irish pubs, and from accepting employment that would associate him with any Irish organization. The court concluded, "There is reasonable nexus between the probation conditions and the goals of probation. A convicted criminal may be reasonably restricted as part of his sentence with respect to his associations in order to prevent his future criminality." *Id.* at 556–57.

We think the reasoning of our sister Circuits is sound. The district court was properly of the view that interests of rehabilitation and public safety would be served by "separating" Bolin from racist, anti-Semitic, anti-Muslim, and other threatening communications. We conclude that it could properly do so if the separation was accomplished by means well-focused enough to preserve those rights to free expression to which Bolin remained entitled.

We thus conclude that Condition 3 was sufficiently related to Bolin's crime of conviction to survive scrutiny through the lens of the relevant statutory and Guidelines prescriptions.

### b. *Condition 4*

We conclude that Condition 4, too, meets the "sufficiently related" criteria. It requires Bolin to participate in a monitoring program operated by the U.S. Probation Office if he seeks to use or possess a computer or other device capable of connecting to the internet.

We approved such monitoring by the Probation Office last year in *United States v. Eaglin*, 913 F.3d 88 (2d Cir. 2019). Placing substantial reliance on the Supreme Court's observations in *Packingham v. North Carolina*, 137 S. Ct. 1730 (2017), that "social media websites" serve "for many [as] the principal sources for

24

knowing current events, checking ads for employment, speaking and listening in the modern public square, and otherwise exploring the vast realms of human thought and knowledge," *id.* at 1737, we vacated a condition of supervised release that banned a defendant convicted of felonious sexual assault from accessing the internet entirely. *See Eaglin*, 913 F.3d at 95–97. Internet monitoring, as opposed to a blanket ban, we said, "remained to all outward appearances a viable option," as it "would adequately protect the public from [the releasee's] potential misuse of the Internet while imposing a more reasonable burden on [his] First Amendment interest in accessing the Internet." *Id.* at 98.

Our later summary order in the child pornography possession case of *United States v. Savastio*, 777 F. App'x 4 (2d Cir. 2019), supports that view. We again upheld a condition requiring a defendant to engage in computer and internet monitoring while on supervised release. We concluded that, "[i]n light of [the defendant's] history of accessing child pornography over the Internet and his prior violations of supervised release," the enhanced conditions "were reasonably related to, *inter alia*, 'the history and characteristics of the defendant.'" *Id.* at *6–7 (quoting U.S.S.G. § 5D1.3(b)).

Unlike the case at bar, of course, *Eaglin* and *Savastio* involved defendants convicted of child-related sex offenses where access to even private communications of the defendants was necessary to ensure that they were not continuing to commit the same crime of conviction or one very much like it. We nonetheless find in them support for our conclusion: In light of Bolin's prior use of the internet to spread racial and religious hate and promote violence, combined with the government's concern about his being armed and having lied about it to the FBI, we think that monitoring Bolin's internet activity is reasonably related to, *inter alia*, his "history and characteristics." U.S.S.G. § 5D1.3(b).

"[A] 'monitoring condition must be narrowly tailored, and not sweep so broadly as to draw a wide swath of extraneous material into its net.'" *United States v. Browder*, 866 F.3d 504, 511 (2d Cir. 2017) (quoting *United States v. Lifshitz*, 369 F.3d 173, 190 (2d Cir. 2004)). In light of the requirement under Condition 4 that any examination of Bolin's internet-capable devices must be "triggered by impermissible/suspicious activity," and "designed to avoid, as much as possible, reading any privileged information or any private material that is not illegal or in violation of Condition #3," *United States v. Bolin*, No. 19-06072-DGL, (W.D.N.Y. July 3, 2019), Judgment, ECF No. 29 at 5, App'x at 122, we conclude that the district

court's exercise of discretion in issuing Condition 4 was well within established limits.

**B.** *Constitutionality of Condition 3 Under the First Amendment*

Bolin argues also that Condition 3 infringes upon his First Amendment right to free speech. Up to a point, we agree.

A defendant does not surrender all his constitutional rights as he enters a prison door to serve his term of incarceration; less so as he exits it on supervised release. It is thus undisputed — indeed beyond dispute — that a person on supervised release retains some First Amendment rights, and in particular, those relating to the ability to gain access to and employ the internet that is at issue here. *See, e.g., Eaglin, supra* (with respect to state parole); *cf. Packingham, supra* (with respect to registered sex offenders). As we said in *Myers*, 426 F.3d at 126:

> If a special condition implicates a fundamental liberty interest, we must carefully examine it to determine whether it is "reasonably related" to the pertinent factors, and "involves no greater deprivation of liberty than is reasonably necessary," 18 U.S.C. § 3583(d), and our application of these criteria must reflect the heightened constitutional concerns. If the liberty interest at stake is fundamental, a deprivation of that liberty is "reasonably necessary" only if the deprivation is narrowly tailored to serve a compelling government interest.

It is also indisputable, however, that those expressional rights may to some extent be limited during both imprisonment and supervised release. We have noted, for example, that "the First Amendment rights of parolees [a New York State parallel for present purposes to those on federal supervised release] are circumscribed." *Farrell v. Burke*, 449 F.3d 470, 497 (2d Cir. 2006).

As we have summarized applicable law, then:

> Due process requires that the conditions of supervised release be sufficiently clear to "'give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly.'" [*United States v.*] *Cabot*, 325 F.3d [384,] 385 [(2d Cir. 2003)] (*quoting Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972)); *see also LoFranco v. United States Parole Comm'n*, 986 F.Supp. 796, 810–11 (S.D.N.Y.1997). A statute violates due process of law if it "either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." *Connally v. General Constr. Co.*, 269 U.S. 385, 391 (1926). Although a condition of supervised release applies only to the releasee, rather than to the general public, "[a] probationer [ ] has a[ ] due process right to conditions of supervised release that are sufficiently clear to inform him of what conduct will result in his being returned to prison." *United States v. Guagliardo*, 278 F.3d 868, 872 (9th Cir.2002); *see also Cabot*, 325 F.3d at 385; *LoFranco*, 986 F.Supp. at 811 (special condition prohibiting petitioner from associating with "outlaw motorcycle gangs" was unconstitutionally vague).

*United States v. Simmons*, 343 F.3d 72, 81 (2d Cir. 2003); *accord United States v. Reeves*, 591 F.3d 77, 80–81 (2d Cir. 2010). As presently written and carefully read, Condition 3 does not meet these criteria.

To repeat, the district court having added the language announced during the colloquy at Bolin's July 2, 2019, sentencing hearing, Condition 3 now provides:

> The defendant shall not: post on, or upload to, any Internet website; or transmit, by any electronic means, including but not limited to email and text messaging, and regardless of whether it is accessible by one or more than one person, any statements or other content, whether verbal, pictorial, or otherwise, that promotes or endorses violence, unlawful activity, or any groups that espouse such ideas. **Violence includes: violence against persons because of their membership in a certain social group or race, bias related violence or criminal conduct.** That includes forwarding, "liking," or otherwise endorsing such content posted or transmitted by others, in a way that is visible to others or that would tend to further disseminate such messages or content. The defendant shall not post *any* messages, photographs, or other content, on any website that promotes or endorses violence or unlawful activity, or that is maintained by an individual or group that publicly promotes or endorses violence or unlawful activity, regardless of the nature of the message or content.

*United States v. Bolin*, No. 19-06072-DGL, (W.D.N.Y. July 3, 2019), Judgment, ECF No. 29 at 5, App'x at 122 (sentence in bold type inserted by district court in response to July 2 colloquy).

As Condition 3 now reads, we think it is impossible for a reasonable person bound by it to fully understand the meaning of "violence" in this context, and thus to understand what speech of his is forbidden. The condition prohibits Bolin from engaging in internet speech "that promotes or endorses violence, unlawful activity, or any groups that espouse such ideas" where the word "violence"

29

"*includes*: violence against persons because of their membership in a certain social group or race, bias related violence or criminal conduct." *Id.* (emphasis added). The court's addition to Condition 3 thus, surely contrary to the district court's intention, made things more problematic by stating what the term violence "includes" without actually defining the term. Rather than narrow the scope of the forbidden speech, the language added on July 3 blurs it.

The principal problem is that upon the amendment of the condition, instead of prohibiting *only* "post[ing] on, or upload[ing] to, any Internet website; or transmit[ting], by any electronic means" material that promotes or endorses race-based or bias-motivated violence, the condition continues to forbid Bolin from doing so irrespective of whether the communication is of the kind of hate speech that ultimately led to Bolin's conviction. It thus may be read to prohibit Bolin from speaking online about violence that is not race-based or bias-motivated and, therefore, potentially a vast panoply of topics whose boundaries are remarkably ill-defined.

For one of any number of random examples, Condition 3 leaves unclear whether Bolin would be permitted to post a message on the New England Patriots' website urging the completion of a full season of football in 2020-21 despite the

pandemic, inasmuch as football may, of course, be considered a form of violence.[8]

And we cannot ascertain from its language whether the condition would allow

Bolin to "like" internet content advocating more aggressive American military

action in Iraq and Afghanistan. Bolin is even left to wonder whether he is

permitted to post a message on a website urging people to participate in, say, a

Texas "rattlesnake roundup."[9] For better or worse, the opportunities to engage

with violent material on the internet — as forbidden by a plain reading of

Condition 3 in its present form — appear to be virtually endless.

---

[8] Were Bolin to seek help from Google on the question, on his first several tries, he would likely come across Kate Dailey, "NFL safety: Is American football too violent?" *BBC News Magazine*, Washington, 13 September 2012, *https://www.bbc.com/news/magazine-19549703* (last visited 9/14/2020): "Charlie Camosy is a big fan of American football. . . . But Camosy is also a professor of Christian ethics at Fordham University in New York. . . . 'Even though I'm excited for the start of the year, we need to be honest about the fact that football is a violent sport, and many things that people like about it, including me, is the violence. It's not just violence in the abstract, it's people's lives who are tremendously impacted by this[,]' says Camosy."

[9] *See, e.g.*, Karin Brulliard, "How to kill thousands of rattlesnakes in just four days," *Washington Post*, March 12, 2016, *https://www.washingtonpost.com/news/animalia/wp/2016/03/12/how-to-kill-thousands-of-rattlesnakes-in-just-four-days/* (last visited 9/14/2020) ("A reporter for the Midland Reporter-Telegram described the spectacle as 'a spaghetti of writhing angry reptiles' that emanates 'a strange dense smell with an evil vomit-like edge to it.' Then, he wrote, 'denim-clad Jaycees lob off their heads, strip their skin and disembowel their gizzards. The snake's tiny hearts are set aside into a gory pile, each one still beating out its own rhythm — a hundred little pebble-sized hearts still twitching with life.'")

Although the error strikes us as unintentional, it is error just the same. The condition is not "sufficiently clear to inform [Bolin] of what conduct will result in his being returned to prison." *Simmons*, 343 F.3d at 81 (citation omitted).

This is not a flaw that seems to be difficult to correct. For example, the added sentence might be moved to the end of the text of Condition 3 so that it applies to limit all the restrictions in the condition, including those contained in the last sentence. If the added sentence were also amended to read something like: "'Violence' as used in this paragraph *means*: violence against persons because of their membership in a certain social group or race, bias related violence or criminal conduct," perhaps with the additional detail that it applies only to messages that (1) target people because of their membership in a certain social group or race, (2) endorses bias related violence or (3) endorses [violent] criminal conduct, we doubt that it would be too vague to follow or improperly intrude on Bolin's right to communicate using the internet.

But we do not decide that issue here because any hypothetical "fix" is not before us for review. The district court is responsible, in the first instance, for adopting a condition of supervision that effects the goals the court seeks to achieve regarding Bolin's conduct, while respecting his constitutional rights. We outline

32

potential "fixes" here simply to illustrate further the defects in the condition as written and not as a direction as to what a proper condition relating to this subject must contain or how it must be expressed.

## CONCLUSION

For the foregoing reasons, we conclude that both Conditions 3 and 4 of Bolin's supervised release are sufficiently related to his crime of conviction to satisfy the provisions of the U.S.S.G. and the U.S. Code that govern conditions of supervised release. The judgment is therefore affirmed as to Condition 4. But because we also conclude that Condition 3, as currently written, infringes upon Bolin's First Amendment right to free speech, we vacate that portion of the judgment and remand the case to the district court for resentencing consistent with this opinion. If this case returns to this Court, in light of this panel's familiarity with the matter, we respectfully direct the Clerk of this Court to return the case to this panel for further review and adjudication.[10]

---

[10] *Cf. United States v. Jacobson*, 15 F.3d 19 (2d Cir. 1994).

# Appendix

*United States v. Bolin*, No. 19-06072-DGL, (W.D.N.Y. May 14, 2019), Plea Agreement, ¶ 4, ECF No. 10 at 2–4, App'x at 22–24.

## FACTUAL BASIS

4.     The defendant and the government agree to the following facts, which form the basis for the entry of the plea of guilty including relevant conduct:

  a. On March 15, 2019, a gunman attacked two mosques in Christchurch, New Zealand, shooting and killing 50 worshippers and civilians, and injuring 50 others. That same day, a Facebook user by the named of "Ragnar Odinson" – who was a member of a Facebook group called "Odin's Warriors" – made statements on Facebook in which he, among other things, called for a re-enactment of the mosque attacks Christchurch, New Zealand, and indicated that he was willing to "do something" the following week.

  b. In March 2019, the defendant, **THOMAS ALONZO BOLIN**, was a member of and the administrator for the "Odin's Warriors" Facebook group. The defendant used a Facebook account with the user name "Peter Vincent" to post messages on Facebook and communicate with other members of the "Odin's Warriors" Facebook group. In those messages, the defendant, among other things, made statements consistent with white supremacist ideology, references to the Christchurch mosque attacks (including the gunman's manifesto and the video of one of the attacks), and statements threatening violence against Muslims and others, and used derogatory terms to refer to Muslims and other minority groups.

  c. For example, on March 15, 2019, the defendant posted the following statements, among others: "As a people we must accept the old gods and rally around our kin. And fight back against the kikes.islamic filth and the niggers in that order"; the defendant posted two photographs – one with the caption "how muslims see white people," which depicted a white male pointing a shotgun toward the camera, and one with the caption "how white people see muslims," which consisted of a still photograph from the Christchurch gunman's video of the attack showing a long gun being pointed downrange toward a mosque; and the defendant, in a Facebook message to his girlfriend, stated, "Come on they are muslim rats they would gladly do the worse to you or me. it does my hart good to see thim run down infront of their sandnigger god" (referring to the Christchurch attacks).

  d. In addition, on March 15, 2019, the defendant sent a Facebook message to "Ragnar Odinson" stating that the gunman in the Christchurch attacks "killed 40 muslims . . . ran up in a mosque with an" AR-15 rifle. Odinson responded with a heart emoji and the post, "Lovely." Odinson then shared links to the Christchurch gunman's manifesto and video of the attack with members of the "Odin's Warriors" Facebook group, including the defendant.

  e. On March 12, 2019, prior to the Christchurch attacks, the defendant sent a photograph of himself wearing a red devil mask and pointing the barrel of a shotgun at the camera to another Facebook user via Facebook Messenger.

f. In late March 2019, the Federal Bureau of Investigation, Rochester Resident Agency (FBI), initiated an investigation of the defendant, **THOMAS ALONZO BOLIN**, and other members of the "Odin's Warriors" Facebook group. The FBI was investigating possible violations of federal civil rights laws (including 18 U.S.C. §§ 241 (conspiracy to violate civil rights), 247 (obstruction of persons in the free exercise of religious beliefs)), and firearms laws (including 18 U.S.C. § 924(c) (possession and use of firearms in furtherance of a crime of violence)).

g. As part of the investigation, FBI Special Agent Kevin Black and FBI Task Force Officers Scott Hill and Eric Norcross, interviewed the defendant in the vicinity of 4480 Culver Road, Irondequoit, Western District of New York, on March 30, 2019. During the interview, the defendant knowingly and willfully made a material false statement to FBI Special Agent Kevin Black, and FBI Task Force Officers Scott Hill and Eric Norcross. Specifically, the defendant falsely told them that he did not possess any firearms in New York State. In fact, the defendant knew at the time that he made that statement to the FBI that he possessed a Mossberg, Model 590, 12-gauge shotgun, bearing serial number V0853179, in his bedroom closet at 34 Third Avenue, Greece, New York. This false statement was material to the FBI's investigation of possible violations of federal civil rights and firearms laws by the defendant and others.

h. The FBI is a part of the executive branch of the government of the United States, and conducting an investigation into potential violations of federal civil rights and firearms laws is within the jurisdiction of the FBI and the executive branch of the government of the United States.