IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 39227-9-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JERRY KEVIN HARRIS, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

COONEY, J. — At the conclusion of trial, a jury convicted Jerry Harris of child

molestation in the second degree (Count 1), rape of a child in the second degree (Count

2), and rape of a child in the third degree (Count 3). The jury also returned special

verdicts finding various aggravators. Mr. Harris appeals, arguing he was afforded

ineffective assistance of counsel, the prosecutor committed misconduct, one of the

aggravators is not supported by substantial evidence, cumulative errors deprived him of a

fair trial, the victim penalty assessment (VPA) and DNA collection fee were erroneously

imposed against him, two of his community custody conditions are unconstitutional, and

Count 3's combined term of imprisonment and community custody exceeds the statutory

maximum.

No. 39227-9-III
*State v. Harris*

We affirm Mr. Harris's convictions but remand for the trial court to strike the VPA and DNA collection fee from the judgment and sentence, amend two of the community custody conditions, and correct Count 3's term of community custody.

BACKGROUND

In 2012 or 2013, Mr. Harris moved in with then-12-year-old Emma[1] and her mother (Mother). Mr. Harris is a distant cousin to Mother and Emma. Mr. Harris slept on the living room couch and Mother spent much of her time in her bedroom, suffering the effects of post-traumatic stress disorder (PTSD), anxiety, and major depressive disorder. Mr. Harris and Emma often spent time together, playing video games and watching movies.

Shortly after moving in with Emma and Mother, Mr. Harris began inappropriately touching Emma while they watched movies. Mr. Harris's inappropriate touching soon led to he and Emma having "sexual intercourse." Rep. of Proc. (RP) at 529-30. Emma testified that the "[v]aginal penetration" began when she was 12 or 13 years old and occurred "[a]t least five times a week," absent any form of birth control. RP at 530.

Emma first told Mother about Mr. Harris's abuse when she "got pregnant for the first time" at 14 years old. RP at 531. Following the disclosure, Mr. Harris "convinced

---

[1] We use a pseudonym to protect the privacy interest of the victim. Gen. Ord. of Div. III, *In re the use of Initials or Pseudonyms for Child Victim or Child Witnesses* (Wash. Ct. App. June 18, 2012), https://www.courts.wa.gov/appellate_trial_courts /?fa=atc.genorders_orddisp &ordnumber=2012_001&div=III.

2

[Mother] that he loved [Emma]. And so, she didn't do anything." RP at 531. On April 26, 2015, at 9 weeks gestation, Emma terminated the pregnancy. After Emma's first pregnancy, Mr. Harris continued the sexual abuse, resulting in Emma becoming pregnant a second time at 16 years old. The second pregnancy was terminated on June 26, 2017, at 12 weeks gestation.

The sexual abuse led to the arrest of Mr. Harris by the Walla Walla Police Department on March 11, 2020. Following his arrest, Mr. Harris waived his *Miranda*[2] rights and submitted to a videotaped interview with Detective Katherine Loney that lasted over an hour. Mr. Harris claimed that he and Emma did not begin a sexual relationship until after she turned 18 and that he believed these charges stemmed from Emma's mother or father were "just mad" at him and "taking it out" on him for getting Emma pregnant. Ex. 3, at 4 min., 44 sec. through 4 min., 50 sec.

When confronted with the information Detective Loney had gathered from Emma and her family, Mr. Harris confessed to having a sexual relationship with Emma and impregnating her multiple times prior to her 18th birthday. In the interview, Mr. Harris also said,

> Let's look at it from the perspective [unintelligible] of, uh, nature. And any animal on the planet has children as soon as they can, basically. As soon as they're biologically able. And so, if [Emma] was biologically able to get pregnant, then she was by nature, not by man-made's rules, by nature's rules, she was ready to start a relationship.

---

[2] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

Ex. 3, at 35 min., 47 sec. through 36 min., 20 sec.

On March 12, 2020, Mr. Harris was charged with child molestation in the second degree, rape of a child in the second degree, and rape of a child in the third degree. For the charge of rape of a child in the second degree, the Information alleged, in part, that the sexual intercourse occurred "on or between June 1, 2013 and May 31, 2014." Clerk's Papers (CP) at 13.

On January 12, 2022, the State filed its notice of intent to seek an exceptional sentence on each of the three counts based on the crimes being "part of an ongoing pattern of abuse of the same victim under the age of 18 years manifested by multiple incidents over a prolonged period of time," and for Mr. Harris's "egregious lack of remorse." CP at 265-67. The State also sought an additional aggravator for the crimes "result[ing] in the pregnancy of a child victim of rape" for Counts 2 and 3. CP at 266-67.

Multiple witnesses testified for the State including: Mother, Tori Ebding, Detective Loney, Timothy Hollingsworth, and Emma. The State's witnesses testified consistent with the above facts.

Mother was accompanied at trial by her service dog and testified that she had been diagnosed with PTSD, anxiety, and major depressive disorder. She testified that her mental health issues made it difficult for her to leave her bedroom at some points, including during the time Mr. Harris lived with her and Emma. Mother testified that

4

when she became apprised of Mr. Harris's sexual relationship with Emma, Mr. Harris made "vail[ed] [sic] threats" to her. RP at 386-87. She testified that Mr. Harris advised her, "I don't remember exactly what he said, but it was basically along the lines of I would never see [Emma] again . . . if I said anything." RP at 387. Mother also testified that, "Toward[ ] the end [Mr. Harris] threatened—threatened to—threatened to kill [Emma], her baby, this made up guy, her dad . . . he threatened to kill pretty much the whole world and me." RP at 388-89. She also testified that, "[Mr. Harris] had a machete hanging off of his bed . . . [and h]e had a rifle of some sort." RP at 399. The trial court overruled defense counsel's objection to Mother's testimony regarding the machete and the rifle.

Prior to Ms. Ebding testifying, the court granted defense counsel's request that the State make an offer of proof related to the substance of Ms. Ebding's testimony. During the offer of proof, Ms. Ebding testified about an interaction between Mr. Harris and Emma in which she witnessed Mr. Harris "caress[ing]" Emma as they got off of his motorcycle in a grocery store parking lot. RP at 360-61. Defense counsel objected to inclusion of testimony regarding this interaction. The court ruled that Ms. Ebding could testify about the interaction but that her testimony should be kept "relatively narrow. And then otherwise, as previously indicated to her observations, and whatnot." RP at 367.

5

Before the jury, Ms. Ebding testified she witnessed then-15-year-old Emma get off of Mr. Harris's motorcycle in a Walmart parking lot. She testified that she was concerned about "[t]heir body language, the way they were looking at each other, the way he was caressing her as she was getting off of his motorcycle. . . . Just the gaze in their eyes between the two. It was definitely more than cousins." RP at 374.

Emma testified consistent with the above facts. Emma additionally testified that Mr. Harris "threw all of us around and broke things," that Mr. Harris "threatened to hurt my friends. He threatened to hurt my mom" if she did not respond to his text messages, and, over the defense's objection, that Mr. Harris "would beat" her dog. RP at 535-36, 549.

Detective Loney testified that in 2020, Emma reported she had been molested and raped as a juvenile by Mr. Harris. Ultimately, Mr. Harris was arrested and brought to the Walla Walla Police Department for an interview. Mr. Harris agreed to speak with Detective Loney and to having the interview recorded. The interview was played for the jury.

Mr. Harris testified that he and Emma played videogames together for hours "on a daily basis." RP at 578. Mr. Harris testified he and Emma did not have a sexual relationship until "August 10, 2018," when Emma was 18 years old. RP at 581. Mr. Harris testified that during the recorded interview he began agreeing with whatever Detective Loney said because he was depressed, upset, and suicidal. He stated that he

6

only began the discussion about "the laws of nature" during the interview "to make things worse for [him]self." RP at 591. Mr. Harris testified that he began "falsely admitting things" during the police interview, including that he was the father of all of Emma's pregnancies. RP at 596. He further stated:

> I have a very bad habit of making my situation worse when I feel like I have no way out. . . . And so, I kind of got into that mindset in the interview and when I started agreeing to everything, I just started saying things that I felt would make people hate me more.

CP at 602-03.

During summation, the State presented, absent any objection by defense counsel, the following argument pertaining to the egregious lack of remorse aggravator:

> Finally, as far as the egregious lack of remorse. And as the Judge instructed you, it's not just because he didn't take responsibility or he took the case to trial, which is his absolute right to do. He has a right to have you folks sit here and make a determination about what happened.
> However, in his interview with Kathy Loney, he deflects constantly, trying to pass the buck. Trying to blame anything and anyone else, other than himself, to not take responsibility not only for this, but for anything else in his life. It is always someone else's fault by the defendant's statements. Someone else is doing things to him. Someone else hates him. That it's a personal vendetta against him. No recognition of the harm, ongoing harm. You saw [Emma] sitting here in the witness chair shaking like a leaf as she tried to tell you specifically what the defendant had done to her. Ongoing harm of this type of a situation.

RP at 634-65.

The jury found Mr. Harris guilty on all counts and returned special verdicts finding each of the aggravators.

At sentencing, the trial court imposed an indeterminate sentence with an exceptional minimum term of 240 months to life on Count 2. In ordering an exceptional sentence, the trial court found that the three aggravators "taken together or considered individually, constitute sufficient cause to impose the exceptional sentence. This court would impose the same sentence if only one of the grounds listed in the preceding paragraph is valid." CP at 327.

The trial court imposed 75 months of confinement on Count 1 and 60 months on Count 3, both concurrent with the 240 months ordered on Count 2. Community custody was ordered for up to 36 months on Counts 1 and 3, with a handwritten notation by the trial court "up to Stat-Max." CP at 336. Although Mr. Harris was found to be indigent, the court ordered the VPA and DNA collection fee. Finally, the court ordered various community custody conditions, including conditions 24 and 25 which stated:

> 24. [X] No internet access or use, including email, without prior approval of the supervising CCO[3] and Treatment Provider.
> 25. [X] No use of a computer, phone, or computer-related device with access to the Internet or on-line computer service except as necessary for employment purposes (including job searches). The CCO is permitted to make random searches of any computer, phone or computer-related device to which the defendant has access to monitor compliance with this condition.

---

[3] Community corrections officer.

8

CP at 348.

Mr. Harris appeals.

## ANALYSIS

On appeal, Mr. Harris contends he was afforded ineffective assistance of counsel, the prosecutor committed misconduct during closing argument, one of the aggravators is not supported by substantial evidence, cumulative errors deprived him of a fair trial, the VPA and the DNA collection fee were erroneously imposed against him, two of his community custody conditions are unconstitutional, and the combined term of imprisonment and community custody for Count 3 exceeds the statutory maximum. We address each argument in turn.

### WHETHER DEFENSE COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT OR REQUEST A LIMITING INSTRUCTION

Mr. Harris asserts his trial attorney was ineffective for failing to object to certain testimony or, in the alternative, in failing to request a limiting instruction for the jury. The State responds that the evidence Mr. Harris complains of was admissible under ER 404(b) and the decision not to seek a limiting instruction was tactical, therefore not deficient. We agree with the State.

Defendants have a constitutionally guaranteed right to effective assistance of counsel. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22; *State v. Lopez*, 190 Wn.2d 104, 115, 410 P.3d 1117 (2018). A claim of ineffective assistance of counsel is an issue

9

of constitutional magnitude that may be considered for the first time on appeal. *State v. Nichols*, 161 Wn.2d 1, 9, 162 P.3d 1122 (2007). Ineffective assistance of counsel claims are reviewed de novo. *State v. White*, 80 Wn. App. 406, 410, 907 P.2d 310 (1995).

A defendant alleging ineffective assistance of counsel bears the burden of showing deficient representation. *State v. McFarland*, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995). To succeed, a defendant must show that his counsel's performance fell below an objective standard of reasonableness based on consideration of all the circumstances and, if so, that there is a reasonable probability that but for counsel's poor performance, the outcome of the proceedings would have been different. *Id.* at 334-35. If either element is not satisfied, the inquiry ends. *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009).

The reasonableness of counsel's performance is to be evaluated from counsel's perspective at the time of the alleged error and in light of all the circumstances. *Kimmelman v. Morrison*, 477 U.S. 365, 384, 106 S. Ct. 2574, 91 L. Ed. 2d 305 (1986). When counsel's conduct can be characterized as a legitimate trial strategy or tactic, their performance is not deficient. *Kyllo*, 166 Wn.2d at 863.

Even if trial counsel's performance was deficient, a defendant must affirmatively prove prejudice. *State v. Thomas*, 109 Wn.2d 222, 225-26, 743 P.2d 816 (1987). This requires more than simply showing that "the errors had some conceivable effect on the outcome." *Strickland v. Washington*, 466 U.S. 668, 693, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). A defendant demonstrates prejudice by showing that the proceedings would

10

have been different but for counsel's deficient representation. *McFarland*, 127 Wn.2d at 337.

Mr. Harris alleges seven instances where his prior bad acts were either improperly admitted or properly admitted under ER 404(b) but without a request by defense counsel for a limiting instruction to the jury. The challenged testimony consists of statements that Mr. Harris (1) caressed Emma when she was 15 in a Walmart parking lot; (2) threatened Mother that if she told anyone about his relationship with Emma, Mother would never see Emma again; (3) threatened to kill Emma, her baby, Mother, a "made up guy," and Emma's father, RP at 388-89; (4) possessed a machete and a rifle; (5) "threw all of us around" when he lived with Mother and Emma, RP at 535; (6) would beat Emma's dog; and (7) threatened to hurt Mother or Emma's friends if Emma did not respond to his text messages.

ER 404 reads:

> **(a) Character Evidence Generally.** Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion, except:
>
> (1) *Character of Accused.* Evidence of a pertinent trait of character offered by an accused, or by the prosecution to rebut the same;
>
> (2) *Character of Victim.* Evidence of a pertinent trait of character of the victim of the crime offered by an accused, or by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the victim offered by the prosecution in a homicide case to rebut evidence that the victim was the first aggressor;
>
> (3) *Character of Witness.* Evidence of the character of a witness, as provided in rules 607, 608, and 609.

**(b) Other Crimes, Wrongs, or Acts.** Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Notably, two of the challenged statements *were* objected to by defense counsel during trial. Defense counsel objected to Mother's testimony that Mr. Harris "had a machete" and a "rifle of some sort," RP at 399, and Emma's testimony that Mr. Harris beat her dog. Because defense counsel unsuccessfully objected to this testimony, Mr. Harris argues that defense counsel should have requested a limiting instruction to the jury.

Given defense counsel objected, "We can presume counsel did not request limiting instructions to avoid reemphasizing damaging evidence." *State v. Dow*, 162 Wn. App. 324, 335, 253 P.3d 476 (2011). After lodging unsuccessful objections to the testimony, it was a legitimate trial tactic for defense counsel not to then request a limiting instruction which would have only reemphasized the damaging evidence. Defense counsel was not deficient in failing to request a limiting instruction to the jury.

Ms. Ebding's testimony that she saw Mr. Harris "caressing" a then-15-year-old Emma as they got off of Mr. Harris's motorcycle was ruled to be admissible following the State's voir dire of Ms. Ebding. RP at 374, 365-66. The trial court reasoned that Ms. Ebding's testimony was admissible to show "an ongoing pattern of sexual abuse of the same victim" and to show the dynamics between Mr. Harris and Emma. *State v.*

12

*Crossguns*, 199 Wn.2d 282, 296, 505 P.3d 529 (2022); ER 404(b). Because defense counsel *did* object to this testimony, Mr. Harris's argument on appeal is that a limiting instruction to the jury should have been requested. Defense counsel's failure to request a limiting instruction was not only a tactical decision, it also would have been a futile act given the trial court's ruling on the admissibility of the evidence.

As to the remaining challenged testimony, defense counsel was not deficient for failing to object because any objections would have likely been unsuccessful. The evidence that Mr. Harris threatened Mother—that she would never see Emma again if she disclosed to anyone his relationship with Emma—was relevant and admissible to explain Mother's failure to report the abuse. Likewise, Emma's testimony that Mr. Harris threatened to kill her and others, and that he threatened to kill Emma and her friends if Emma did not respond to his text messages, was relevant and admissible to explain why Emma delayed reporting the abuse.

Moreover, this evidence was admissible under ER 404(b) to demonstrate "the dynamics" among Mr. Harris, Emma, and Mother. *See Crossguns*, 199 Wn.2d at 295. As *Crossguns* recognized, "'Two necessary components' for the commission of sex crimes 'are access and control.'" *Id.* (citing Basyle J. Tchividjian, *Predators and Propensity: The Proper Approach for Determining the Admissibility of Prior Bad Acts Evidence in Child Sexual Abuse Prosecutions*, 39 AM. L. CRIM. L. 327, 364, 368 (2012)).

"[T]he State is entitled to anticipate matters of defense in its case-in-chief." *State v. Anderson*, 15 Wn. App. 82, 84, 546 P.2d 1243 (1976). Though Mr. Harris's defense was a denial that he had a sexual relationship with Emma prior to her 18th birthday, the State was entitled to produce evidence to explain why Mother and Emma failed for years to report Mr. Harris's abuse. Further, Ms. Ebding's testimony about an inappropriate interaction between Mr. Harris and Emma when Emma was 15 undermined Mr. Harris's denial defense as it tended to show there was an ongoing, inappropriate relationship between the two prior to Emma reaching the age of majority. Finally, as discussed above, defense counsel was not deficient in electing not to request a limiting instruction to the jury when doing so would only have reemphasized the damaging testimony.

Finally, even if defense counsel was deficient for failing to object or request a limiting instruction, Mr. Harris fails to establish prejudice. Mr. Harris's defense was a denial that he had a sexual relationship with Emma prior to Emma turning 18 years of age. The evidence at trial included Mr. Harris's entire videotaped confession, a multitude of incriminating text messages between Mr. Harris and Emma, and testimony from Emma about Mr. Harris's sexual abuse that resulted in three pregnancies. Mr. Harris is unable to show that the result of his trial would have been different had his trial attorney objected or requested a limiting instruction relative to the above-referenced admissible testimony.

Mr. Harris's trial attorney was not ineffective for failing to object or request a limiting instruction. Even if we concluded otherwise, Mr. Harris has failed to demonstrate prejudice.

WHETHER THE PROSECUTOR COMMITTED MISCONDUCT OR, ALTERNATIVELY, WHETHER TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT TO THE PROSECUTOR'S ARGUMENTS

Mr. Harris contends the prosecutor committed prejudicial misconduct by arguing that Mr. Harris showed an egregious lack of remorse for his actions. Alternatively, Mr. Harris asserts that his trial attorney was ineffective for failing to object to the State's arguments. We disagree with both arguments.

Prosecutorial misconduct is grounds for reversal if "'the prosecuting attorney's conduct was both improper and prejudicial.'" *State v. Monday*, 171 Wn.2d 667, 675, 257 P.3d 551 (2011) (quoting *State v. Fisher*, 165 Wn.2d 727, 747, 202 P.3d 937 (2009)). The defendant bears the burden of proving that the prosecutor's conduct was both improper and prejudicial. *State v. Emery*, 174 Wn.2d 741, 756, 278 P.3d 653 (2012). A prosecutor's argument must be confined to the law stated in the trial court's instructions. *State v. Walker*, 164 Wn. App. 724, 736, 265 P.3d 191 (2011). When the prosecutor mischaracterizes the law and there is a substantial likelihood that the misstatement affected the jury verdict, the prosecutor's actions are considered improper. *Id.* Prosecutors have "wide latitude" in summation to argue reasonable inferences to be

15

drawn from the evidence at trial. *Crossguns*, 199 Wn.2d at 296-97 (internal quotation marks omitted).

If a defendant fails to object at trial to the prosecutor's misconduct, then the defendant is deemed to have waived any error, unless the prosecutor's misconduct was so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice. *Emery*, 174 Wn.2d at 760-61. "Under this heightened standard, the defendant must show that (1) 'no curative instruction would have obviated any prejudicial effect on the jury' and (2) the misconduct resulted in prejudice that 'had a substantial likelihood of affecting the jury verdict.'" *Id.* at 761 (quoting *State v. Thorgerson*, 172 Wn.2d 438, 455, 258 P.3d 43 (2011)).

As explained below, the prosecutor's argument was proper, and Mr. Harris fails to meet the heightened "flagrant and ill intentioned standard." When examining a prosecutor's alleged misconduct, the improper conduct is not viewed in isolation. *Monday*, 171 Wn.2d at 675. Instead, the conduct is looked at "in the full trial context, including the evidence presented, 'the context of the total argument, the issues in the case, the evidence addressed in the argument, and the instructions given to the jury.'" *Id.* (quoting *State v. McKenzie*, 157 Wn.2d 44, 52, 134 P.3d 221 (2006)).

Mr. Harris argues that the prosecutor committed misconduct in arguing that he showed an egregious lack of remorse because the argument undermined his presumption

of innocence, especially when his defense was that he did not commit the charged crimes.

The State responds that the prosecutor was arguing reasonable inferences to be drawn

from the admissible evidence and the argument was related to proving the egregious lack

of remorse aggravator. We agree with the State.

The State sought "egregious lack of remorse" aggravators on all three counts.

CP at 259-61. The jury returned special verdicts, finding Mr. Harris displayed "an

egregious lack of remorse" for each crime. CP at 265-67.

> RCW 9.94A.535(3)(q) states:
>
> The court may impose a sentence outside the standard sentence range for
> an offense if it finds, considering the purpose of this chapter, that there are
> substantial and compelling reasons justifying an exceptional sentence.
> Facts supporting aggravated sentences, other than the fact of a prior
> conviction, shall be determined pursuant to the provisions of RCW
> 9.94A.537.
>
> . . . .
>
> (3) Aggravating Circumstances - Considered by a Jury - Imposed by the
> Court
>
> . . . .
>
> (q) The defendant demonstrated or displayed an egregious lack of remorse.

During closing, the prosecutor stated:

> Finally, as far as the egregious lack of remorse. And as the Judge
> instructed you, it's not just because he didn't take responsibility or he took
> the case to trial, which is his absolute right to do. He has a right to have
> you folks sit here and make a determination about what happened.
> However, in his interview with Kathy Loney, he deflects constantly,
> trying to pass the buck. Trying to blame anything and anyone else, other
> than himself, to not take responsibility not only for this, but for anything

17

> else in his life. It is always someone else's fault by the defendant's statements. Someone else is doing things to him. Someone else hates him. That it's a personal vendetta against him. No recognition of the harm, ongoing harm. You saw [Emma] sitting here in the witness chair shaking like a leaf as she tried to tell you specifically what the defendant had done to her. Ongoing harm of this type of a situation.

RP at 634-35. Defense counsel did not object to the State's argument. Mr. Harris cannot show that the State's argument was improper.

The State's argument regarding the egregious lack of remorse aggravator was tied to Mr. Harris's videotaped confession that was admitted at trial and played for the jury. Further, the State did not misstate the law and did not argue that it was Mr. Harris's denial defense that gave rise to the aggravator. Rather, the State argued it was Mr. Harris's statements in the videotaped confession that warranted the aggravator. The prosecutor explained to the jury that the fact that Mr. Harris "didn't take responsibility" and that "he took the case to trial" were not grounds to find the aggravator. RP at 634. The State's arguments were not improper.

Even if the State's arguments were improper, Mr. Harris is unable to show that no curative instruction would have obviated the resulting prejudice or that it had a substantial likelihood of affecting the jury's verdict. If the argument was improper and objected to, surely a curative instruction reminding the jury that Mr. Harris is presumed innocent unless proven guilty and that he possesses a right to avoid self-incrimination would have cured any prejudice. Further, Mr. Harris cannot show the argument affected

18

the jury's verdict. At most, the argument had a substantial likelihood of affecting the jury's decision on the "egregious lack of remorse" aggravator. But there is no indication that it affected the jury's guilty verdict on any of the charged crimes. Mr. Harris is unable to show prejudice.

Mr. Harris's alternative argument is that defense counsel was ineffective for failing to object to the State's argument. However, because the State's argument was not improper, defense counsel was necessarily not ineffective for failing to object as an objection would have been unsuccessful.

The State's arguments during summation were not improper and defense counsel was not deficient for failing to object.

WHETHER THERE WAS SUFFICIENT EVIDENCE TO SUPPORT THE PREGNANCY AGGRAVATOR

Mr. Harris argues there is insufficient evidence to support the pregnancy aggravator for Count 2. The State responds that there is sufficient evidence to support the aggravator, and even if there is not, this court cannot provide Mr. Harris effective relief because his exceptional sentence is still supported by other aggravators. Though we agree with Mr. Harris, remand to strike the aggravator is unnecessary because the court explicitly found it would impose the exceptional sentence even in the absence of one or two of the three proven aggravating factors. Consequently, any error is harmless.

19

The sufficiency of the evidence is a question of law this court reviews de novo. *State v. Rich*, 184 Wn.2d 897, 903, 365 P.3d 746 (2016). In a sufficiency of the evidence challenge, "we review the evidence in the light most favorable to the State" to determine whether any rational trier of fact could have found the aggravating factor beyond a reasonable doubt. *State v. Varga*, 151 Wn.2d 179, 201, 86 P.3d 139 (2004). "A claim of insufficiency admits the truth of the State's evidence and all inferences that can reasonably be drawn from it." *State v. DeVries*, 149 Wn.2d 842, 849, 72 P.3d 748 (2003). "[I]nferences based on circumstantial evidence must be reasonable and cannot be based on speculation." *State v. Vasquez*, 178 Wn.2d 1, 16, 309 P.3d 318 (2013).

At trial, the State alleged the aggravators "the crime result[ing] in the pregnancy of a child victim of rape" for Counts 2 and 3. RCW 9.94A.535(3)(i); CP at 266-67, 260-61. The jury returned special verdicts, finding Mr. Harris's crimes resulted "in the pregnancy of a child victim of rape" for both counts. CP at 266-67. The jury also returned special verdicts for each count that "the crime [was] part of an ongoing pattern of sexual abuse of the same victim under the age of 18 years manifested by multiple incidents over a prolonged period of time." CP at 265-67.

RCW 9.94A.535(3)(i) reads:

The court may impose a sentence outside the standard sentence range for an offense if it finds, considering the purpose of this chapter, that there are substantial and compelling reasons justifying an exceptional sentence. Facts supporting aggravated sentences, other than the fact of a prior

20

conviction, shall be determined pursuant to the provisions of RCW
9.94A.537.

. . . .

(3) Aggravating Circumstances - Considered by a Jury - Imposed by
the Court

. . . .

(i)     The offense resulted in the pregnancy of a child victim of
        rape.

Here, the charging period for second degree rape of a child was June 1, 2013, to
May 31, 2014. Emma testified that she received her first abortion on "April 26th or 27 of
2015" and that she was nine weeks pregnant at the time of the abortion. RP at 557-58.
This meant Emma likely became pregnant sometime in early 2015, well after the
charging period for Count 2 had expired.

Following trial, Mr. Harris brought a motion to arrest judgment, arguing that some
of the jury's special verdicts and the underlying charges were not sufficient to support the
verdict. The trial court disagreed and denied the motion.

Mr. Harris argues there is insufficient evidence to support the aggravator because
Emma's pregnancy could not have resulted from Count 2 given the charging period. The
State concedes the "apparent anomaly between the charging period and the pregnancy
termination" but argues the aggravator does not have its own time element and that the
aggravator was proven by a continuing course of conduct. Br. of Resp't at 34-35. We
disagree.

The plain language of RCW 9.94A.535(3)(i) requires the pregnancy to have "resulted" from "the offense." Here, the State alleged Count 2 occurred on or between June 1, 2013, and May 31, 2014. CP at 251. However, Emma terminated the pregnancy almost 11 months after the charging period for "the offense" expired. No reasonable trier of fact could have found the aggravating factor beyond a reasonable doubt.

The State argues that the aggravator does not have a time element or that it is supported by Mr. Harris's ongoing pattern of sexual abuse. Those arguments are unavailing. Though the aggravator does not have its own time element, because the pregnancy had to result from the offense, the charging period for the offense is the applicable time period. Holding otherwise would lead to absurd results. The State's "ongoing pattern of sexual abuse" argument fails for similar reasons. The pregnancy did not result from Mr. Harris's "ongoing pattern of sexual abuse," it resulted from a particular instance of sexual abuse that Emma endured. However, that particular instance clearly came after the charging period for the second degree rape of a child charge.

Though the pregnancy aggravator for Count 2 is not supported by substantial evidence, remand is unnecessary because the court explicitly found, when it imposed an exceptional sentence, that the three aggravators "taken together or considered individually, constitute sufficient cause to impose the exceptional sentence. This court would impose the same sentence if only one of the grounds listed in the preceding

paragraph is valid." CP at 327. Thus, the error is harmless. Striking the pregnancy aggravator for Count 2 would make no difference to Mr. Harris's sentence.

There was insufficient evidence to support the pregnancy aggravator but the error was harmless.

WHETHER CUMULATIVE ERRORS DEPRIVED MR. HARRIS OF A FAIR TRIAL

Mr. Harris argues that cumulative errors deprived him of a fair trial. "Under the cumulative error doctrine, a defendant may be entitled to a new trial when cumulative errors produce a trial that is fundamentally unfair." *Emery*, 174 Wn.2d at 766. Mr. Harris asserts that the cumulative effect of the ineffectiveness of his trial counsel, the prosecutorial misconduct, and the insufficiency of the evidence supporting the pregnancy aggravator related to Count 2, rendered his trial unfair. As discussed above, Mr. Harris is only affected by one error, the pregnancy aggravator, and that error is harmless. Mr. Harris's trial was not rendered fundamentally unfair due to cumulative errors.

WHETHER TWO OF MR. HARRIS'S COMMUNITY CUSTODY CONDITIONS ARE UNCONSTITUTIONAL

Mr. Harris argues that community custody conditions 24 and 25 are unconstitutional because they are vague, overbroad, and violate his right to due process. Mr. Harris requests that we remand for the trial court to strike both conditions. We agree with Mr. Harris's constitutional arguments, but rather than directing the trial court to strike the conditions, we remand for the trial court to more narrowly tailor the conditions.

23

Condition 24 reads, "No Internet access or use, including email, without prior approval of the supervising CCO and Treatment Provider." CP at 348. Restrictions on Internet access implicate the First Amendment to the United States Constitution. *Packingham v. North Carolina*, 582 U.S. 98, 104, 137 S. Ct. 1730, 198 L. Ed. 2d 273 (2017).

In *In re Peronal Restraint of Sickels*, 14 Wn. App. 2d 51, 73, 469 P.3d 322 (2020), we interpreted a condition with identical language to condition 24. In so doing, we held that blanket prohibitions on the use of the Internet or Internet-capable devices are overbroad even when the defendant utilized the internet to commit sex offenses. Specific to *Sickels*, we held that the "limitation of Internet use to employment purposes is overly broad" and that the condition's language forbidding "[I]nternet access or use, including email is even more objectionable." *Id.* at 73 (internal quotation marks omitted). There, we endorsed the State's suggestion that the condition prohibiting Internet use be amended to "No [I]nternet use of websites including email, to contact minors, to gather information about minors, or access personal webpages of minors." *Id.* at 71, 74. Although we refrain from directing the trial court to adopt such language, we instruct the trial court to amend the condition to a more narrowly-tailored restriction condition.

Like condition 24, condition 25 contains identical language to a challenged condition in *Sickels*. Condition 25 reads:

> No use of a computer, phone, or computer-related device with access to the Internet or on-line computer service except as necessary for employment purposes (including job searches). The CCO is permitted to make random searches of any computer, phone or computer-related device to which the defendant has access to monitor compliance with this condition.

CP at 348. Mr. Harris argues that the portion of condition 25 allowing the CCO to perform "random searches" of his computer and Internet-capable devices is unconstitutional because it allows searches without reasonable cause.

Generally, warrantless searches are per se unreasonable. *State v. Ladson*, 138 Wn.2d 343, 349, 979 P.2d 833 (1999). However, there are some "'carefully drawn exceptions.'" *State v. Cornwell*, 190 Wn.2d 296, 301, 412 P.3d 1265 (2018) (quoting *Ladson*, 138 Wn.2d at 349). Offenders on community custody are not entitled to the full protection of article I, section 7 of the Washington Constitution because they are persons that a court has sentenced to confinement but who are "'serving their time outside the prison walls.'" *Id.* (quoting *State v. Olsen*, 189 Wn.2d 118, 124-25, 399 P.3d 1141 (2017)). Thus, "it is constitutionally permissible for a CCO to search an individual based only on a 'well-founded or reasonable suspicion of a probation violation,' rather than a warrant supported by probable cause." *Id.* at 302 (quoting *State v. Winterstein*, 167 Wn.2d 620, 628, 220 P.3d 1226 (2009)).

This exception is codified at RCW 9.94A.631(1) that states, "If there is reasonable cause to believe that an offender has violated a condition or requirement of the sentence, a [CCO] may require an offender to submit to a search and seizure of the offender's

25

person, residence, automobile, or other personal property." A CCO "must have 'reasonable cause to believe' a probation violation has occurred before conducting a search at the expense of the individual's privacy." *Cornwell*, 190 Wn.2d at 304 (quoting RCW 9.94A.631(1)). Further, the offender's "privacy interest is diminished only to the extent necessary for the State to monitor compliance with the particular probation condition that gave rise to the search." *Id.* at 304.

However, "[w]hile the failure to include the language does not affect the order's constitutionality, we urge sentencing courts to state explicitly in the order that searches of parolees and probationers must be based on reasonable suspicion." *State v. Massey*, 81 Wn. App. 198, 201, 913 P.2d 424 (1996). Accordingly, we direct the trial court to amend condition 25 to clarify that searches may only be conducted based on a reasonable suspicion.

We remand for the trial court to more narrowly-tailor the restrictions of condition 24 and the scope of condition 25.

WHETHER THE VPA AND DNA COLLECTION FEE WERE ERRONEOUSLY ORDERED

Mr. Harris requests that we remand with directions to the trial court to strike the VPA and DNA collection fee from his judgment and sentence. The State concedes.

Former RCW 7.68.035(1)(a) (2018) required a VPA be imposed on any individual found guilty of a crime in superior court. In April 2023, the legislature passed Engrossed Substitute H.B. 1169 (H.B. 1169), 68th Leg., Reg. Sess. (Wash. 2023), that amended

RCW 7.68.035 to prohibit the imposition of the VPA on indigent defendants.

RCW 7.68.035 (as amended); H.B. 1169, § 1(1), (4).  H.B. 1169 took effect on July 1,

2023.  Amendments to statutes that impose costs upon convictions apply prospectively to

cases pending on appeal.  *See State v. Ramirez*, 191 Wn.2d 732, 748-49, 426 P.3d 714

(2018).

Similarly, pursuant to former RCW 43.43.7541 (2018), the trial court was required

to impose a DNA collection fee for every sentence imposed for the crimes specified in

RCW 43.43.754.  Effective July 1, 2023, the legislature amended RCW 43.43.7541 by

eliminating language that made imposition of the DNA collection fee mandatory.  *See*

LAWS OF 2023, ch. 449, § 4.

Because Mr. Harris's case is pending on direct appeal, the amendments apply.

Further, Mr. Harris was found to be indigent.  Thus, we remand for the trial court to

strike the VPA and DNA collection fee from the judgment and sentence.

WHETHER THE COURT ERRONEOUSLY IMPOSED CONFINEMENT AND COMMUNITY CUSTODY EXCEEDING THE STATUTORY MAXIMUM

Mr. Harris argues that the trial court erred in imposing a combined term of

confinement and community custody that exceeds the statutory maximum for Count 3.

We agree and remand for the trial court to correct the error.

"A trial court may impose a sentence that is only authorized by statute."  *In re

Postsentence Rev. of Leach*, 161 Wn.2d 180, 184, 163 P.3d 782 (2007).  The trial court

errs when it imposes a total term of confinement that exceeds the statutory maximum. *State v. Boyd*, 174 Wn.2d 470, 473, 275 P.3d 321 (2012). An unauthorized sentence may be addressed for the first time on appeal. *State v. Julian*, 102 Wn. App. 296, 304, 9 P.3d 851 (2000). Whether a trial court exceeded its statutory authority when sentencing a criminal defendant is an issue of law that we review de novo. *State v. Murray*, 118 Wn. App. 518, 521, 77 P.3d 1188 (2003).

Rape of child in the third degree is a class C felony. RCW 9A.44.079(2). The maximum sentence for a class C felony is five years (60 months). RCW 9A.20.021(1)(c). In *Boyd*, our Supreme Court explained that "the trial court, not the Department of Corrections, [is] required to reduce [the defendant]'s term of community custody to avoid a sentence in excess of the statutory maximum." 174 Wn.2d at 473. The Court in *Boyd* also noted that a "*Brooks* notation," where the trial court notes that the total term must not exceed the statutory maximum, does not comply with the statutory process for correcting an erroneous judgment and sentence. *Id.* at 472-73 (internal quotation marks omitted).

Here, the trial court imposed 60 months of confinement on Count 3 and also ordered Mr. Harris to serve 36 months of community custody "up to Stat-Max." CP at 336. Because our Supreme Court has held that this notation is insufficient, we remand to the trial court to correct the term of community custody on Count 3 so that Mr. Harris's aggregate term of confinement and community custody does not exceed 60 months.

28

## CONCLUSION

We affirm Mr. Harris's convictions but remand for the trial court to strike the VPA and DNA collection fees from the judgment and sentence, amend community custody conditions 24 and 25, and correct the term of community custody for Count 3.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Cooney, J.

WE CONCUR:

_____
Fearing, J.

_____
Pennell, J.